In re John Marshall PAYNE, III.

**Appeal of Commonwealth of Pennsylvania.**

Superior Court of Pennsylvania.

Argued June 30, 2015.
Filed Dec. 29, 2015.

Stephanie E. Lombardo, Assistant District Attorney, York, for Commonwealth, appellant.

Scott A. McCabe, York, for appellee.

BEFORE: GANTMAN, P.J., BENDER, P.J.E., PANELLA, J., DONOHUE, J., SHOGAN, J., ALLEN, J., LAZARUS, J., MUNDY, J., and STABILE, J.

OPINION BY BENDER, P.J.E.:

Herein, the Commonwealth appeals from the trial court's order granting John Marshall Payne III's request for DNA testing of physical evidence taken from the crime scene of the homicide for which Payne was convicted of second-degree (felony) murder and related offenses. The Commonwealth contends the trial court erred when it found that there was a reasonable probability that the results of the testing could demonstrate Payne's "actual innocence," as is necessary to assert a successful claim under the DNA testing statute, 42 Pa.C.S. § 9543.1. Specifically, the Commonwealth argues that the legal framework of Payne's felony murder conviction precludes such a finding because, in

order to convict him, the jury was not required to determine whether Payne was the principal actor. After careful consideration, we affirm the trial court's order granting testing.

The instant appeal concerns Payne's *pro se* motion/petition titled "Post Conviction Relief Act petition seeking DNA testing pursuant to 42 Pa.C.S. § 9543.1," which he filed on June 14, 2012. However, the procedural history of this case began decades ago. In 1986, Payne was found guilty of second-degree murder, aggravated assault, burglary, and conspiracy, after a trial adjudicating the following facts:

On December 17, 1981, the body of a 90 year-old woman, Elsie Rishel, was discovered in her home by members of her family. N.T., 8/18/86–8/22/86 (vol. II), at 406. The victim died as a result of blunt force trauma to the head from an unknown instrument, possibly a telephone found near her body. *Id.* at 417.[1] Rishel's body was found in her blood-soaked bed, with a pillow on top of her head. *Id.* at 427. A trail of blood ran down from her body to a pool of blood on the floor. *Id.* Rishel's dentures and eyeglass were left in the bathroom. *Id.*[2]

Evidence found at the scene was consistent with the theory that the murder had occurred during the commission of a burglary. Rishel's residence appeared "ransacked," with numerous drawers and trunks left open and their contents strewn about "haphazardly." *Id.* at 427.[3] A single set of footprints left in the snow around Rishel's home led from the street, around the home, and ultimately to a broken window. *Id.* at 462–63. The window's glass was broken inwards from the outside. *Id.* at 446. A single set of footprints also led from the front door on a diagonal trajectory back to the street. *Id.* at 463. The lead investigator, Officer Robert Harman of the Springettsbury Township Police Department, indicated that there was nothing identifiable obtained from the footprints that could be used for comparison to any suspects. *Id.*

Ultimately, no physical evidence tied Payne to the Rishel burglary/murder; however, numerous pieces of physical evidence were collected from the scene of the crime. For instance, several fingerprints were recovered, although none of the recovered fingerprints matched Payne or his alleged co-conspirators. *Id.* at 441–42. Many of the fingerprints either belonged to the victim or her family members. *Id.* at 445. However, at least one unidentifiable partial fingerprint was found on the glass from the broken window. *Id.* at 448–449. This evidence, as well as other items collected from the scene, were sent to the F.B.I. for testing.[4]

---

1. The testifying pathologist, Dr. Joan Gibble, suggested that Rishel's death was likely due to a maximum of three blows, or, stated another way, three "identifiable areas of injury." *Id.* at 420. Dr. Gibble believed that these injuries were consistent with blows delivered from a telephone. *Id.* However, during cross-examination, Dr. Gibble was asked, "From your experience and the extent of the injuries that you observed, could the deceased have suffered such an injury that you observed by falling at someplace in her house and returning to her bed?" *Id.* at 425. Dr. Gibble answered, "Yes, she could have." *Id.* at 426.

2. This was significant because Rishel's daughter had testified that Rishel always placed her glasses right next to her bed when retiring for the evening. *Id.* at 407.

3. According to Rishel's daughter, a camera appeared to be the only item that had been stolen. *Id.* at 407. Indeed, Rishel's pocketbook was left on the kitchen counter, and cash hidden in one of Rishel's drawers had been left untouched. *Id.* at 407–08.

4. Forty-four unique items were sent to an F.B.I. laboratory for testing. Payne's Petition for DNA Testing, 6/14/12, exhibit A. In addition to numerous fingerprints taken from the

In the absence of any physical evidence demonstrating his guilt, Payne's conviction was premised primarily on the testimony of three Commonwealth witnesses: Deborah Wallick, Sonny Oglesby, and Christopher Gibson. Wallick, Oglesby, and Gibson each purportedly heard Payne make inculpatory statements to them, individually, concerning the Rishel burglary/murder. Although their accounts of Payne's inculpatory remarks were consistent in broad strokes, there were some significant details that varied between them. All three testified that Payne had told them that he was accompanied by two cohorts during the home invasion, and that a telephone had been used as the murder weapon.[5] However, their stories differed considerably with regard to other matters, such as whether Payne had killed Rishel himself, as well as the identity of his co-conspirators.

Wallick's, Oglesby's, and Gibson's credibility were also suspect. Wallick could only vaguely recall when and where Payne had incriminated himself. *Id.* at 480, 483, 494. Related, perhaps, was Wallick's admission that she had been a heavy user of LSD at that time when Payne allegedly confessed to his involvement in the burglary. *Id.* at 491. Additionally, Wallick had previously been convicted of hindering prosecution. *Id.* at 489.

Oglesby and Gibson were jailhouse informants who expected to receive leniency in exchange for their testimony against Payne. At the time of trial, Oglesby had pleaded guilty to third-degree murder in an unrelated case, and had yet to be sentenced for that crime. *Id.* at 520. Part of his plea bargain included his promise to testify against Payne regarding a conversation the two had in prison, in which Payne purportedly inculpated himself in Rishel's death. *Id.* at 528. As he had been charged with homicide generally, Oglesby could have been convicted of first-degree murder in the absence of his plea. *Id.* at 529. Indeed, during cross-examination, Oglesby admitted he knew that the District Attorney had intended to seek the death penalty against him if his case had proceeded to trial. *Id.*

Additionally, Oglesby testified that police did not approach him about obtaining information against Payne. *Id.* at 521. He claimed he volunteered the information to the District Attorney's Office. *Id.* However, Officer Harman remembered things differently. He testified that he "[r]eceived street information that there's a possibility that Sonny Olgesby had some information pertaining to the homicide." *Id.* at 459. Based on that information, Officer Harman "got in contact with Mr. Olgesby." *Id.* at 460.

---

scene, these items included a black plastic telephone, a screwdriver, glass from the broken window, the victim's clothing, numerous bed linens, blankets, pillows, tissues found under the victim's body, panties found on the floor in the bedroom, and vacuum sweepings from the bedroom. *Id.*

5. Additionally, there was testimony that Payne had revealed his knowledge that the murder weapon was a telephone under suspicious circumstances. Officer Daniel Garber of the Northern York County Regional Police Department conversed with Payne in March of 1983 regarding an unrelated investigation.

During that conversation, Payne allegedly told Officer Garber that a State Trooper was accusing him of beating a 90–year old woman to death with a telephone. Officer Garber conveyed Payne's comment to Officer Harman. Officer Harman had asked for assistance from the Pennsylvania State Police in the Rishel investigation in January of 1982. Trooper William Lenker had been assigned to provide that assistance. Trooper Lenker testified that, as of March of 1983, he had not yet suspected, nor even identified, the telephone as being the murder weapon.

Gibson was charged with robbery, criminal conspiracy, and firearm offenses before entering a plea bargain just prior to Payne's trial. *Id.* at 545. In exchange for his testimony against Payne, Gibson pled guilty to a single theft offense and received "county time." *Id.* at 550–51, 557. Gibson testified that he had a conversation with Payne in the prison library on August 15, 1986, just three days before the beginning of Payne's trial. *Id.* at 546. Gibson claimed that Payne approached him in the library and asked him what he thought of his legal strategy of deflecting blame for the murder of Rishel onto Rishel's grandson. *Id.* Gibson said he asked Payne "who really done it and he said himself and two other individuals...." *Id.* Gibson also claimed that Payne had asked him a month and a half prior to the August 15th conversation about finding someone to testify that Payne had been employed during the month when Rishel was murdered. *Id.* at 548.

None of these witnesses had any independent knowledge regarding the killing of Elsie Rishel apart from Payne's inculpatory statements, and Payne produced multiple witnesses to rebut Gibson's and Oglesby's testimony. The first of these defense witnesses was Wendell Murray. Murray testified that he assisted Payne in the prison law library on August 15, 1986, the same day Gibson purportedly had a conversation there with Payne. *Id.* at 578. Murray said that he and Payne were engaged in a discussion of Payne's case on that day. *Id.* Murray suggested that Gibson could have learned details of the case by overhearing Payne's conversation with Murray in the close quarters of the prison library. *Id.* Nevertheless, Murray said Payne maintained his innocence in their conversations and, on that specific day, Payne had not spoken directly to Gibson at all. *Id.* at 578–79. Murray also said that Gibson and Oglesby knew each other, and

that he had observed them secretly conversing with one another in the prison courtyard the following day. *Id.* at 580–81.

William Jones, another defense witness, had been in the same pod as Oglesby, and said that he and Oglesby became "close" while in prison together. *Id.* at 589. He testified that Oglesby told him that Oglesby had learned many of the details concerning Payne's case from Officer Harman, and not from his conversation with Payne. *Id.* at 589–90. These details included a telephone being used as a murder weapon and the name of one of Payne's co-conspirators. *Id.* at 590. Jones also indicated that, in the week before Payne's trial, he had seen Oglesby and Gibson speaking together for two hours in the prison courtyard while secluded from the rest of the inmates. *Id.* at 590–91.

Payne testified in his own defense, and denied any level of participation in the burglary or killing of Rishel. *Id.* at 610–42. He said he did not learn that he was a suspect until 1983, and simply did not recall where he was when the crime was committed. He also denied making any inculpatory statements to Wallick, Oglesby, and Gibson. Nevertheless, based primarily on the testimony of those three witnesses, a jury convicted Payne of the above-mentioned offenses. On March 23, 1987, the trial court sentenced Payne to a mandatory term of life in prison.

Payne filed a timely direct appeal, and this Court affirmed his judgment of sentence in a memorandum decision filed on February 29, 1988. *Commonwealth v. John M. Payne, III,* No. 413 Harrisburg 1987, unpublished memorandum at 4, 377 Pa.Super. 655, 541 A.2d 1153 (filed February 29, 1988). It is unclear from the record whether Payne sought review of that decision with our Supreme Court.

Soon thereafter, Payne sought production of certain documents held by the Commonwealth for the purpose of pursuing post-conviction relief. *See* Motion for Production of Documents *Nunc Pro Tunc*, 8/5/88. The trial court denied the motion, and Payne filed a timely appeal from that decision. This Court affirmed, concluding that the trial court did not err in denying Payne's motion as he was not entitled to discovery for post-conviction relief where no post-conviction petition was pending before the trial court. *See Commonwealth v. John M. Payne*, 624 Harrisburg 1988, unpublished memorandum at 1–2 (Pa.Super. filed May 15, 1989), *allocatur denied*, 45 M.D. Misc. Dkt.1990 (January 23, 1991).

Payne subsequently filed his first PCRA[6] petition on June 7, 1991, wherein Payne continued to assert his innocence. *See* Payne's 1991 PCRA Petition, 6/7/91, at 3 (stating "Petitioner has maintained throughout all proceedings that he is innocent of the charges that were brought against him ..."). The 1991 PCRA petition was denied on June 25, 1992, and Payne filed a timely *pro se* appeal. This Court affirmed "the dismissal of all of [Payne]'s PCRA claims except those regarding his judgments of sentence for conspiracy, burglary, and robbery." *Commonwealth v. John M. Payne*, No. 00581 Harrisburg 1992, unpublished memorandum at 18, 431 Pa.Super. 621, 631 A.2d 216 (filed April 30, 1993).[7] Notably, this Court

reversed Payne's conviction for conspiracy, holding that the statute of limitations for that offense had expired when Payne was charged with it in 1986:

> The instant crimes occurred on December 17, 1981. The applicable statute of limitations for conspiracy was two years. 42 Pa.C.S. § 5552(a). On December 14, 1984[,] 42 Pa.C.S. § 5551 was amended to provide that if a murder occurred then there is no statute of limitations regarding a conspiracy charge. The amendment did not apply to [Payne] since his crimes occurred three years prior to the amendment. [Payne] was not charged until January, 1986 with the instant crimes. Hence, the statute of limitations had run on the conspiracy charge. His trial counsel was ineffective for failing to raise this issue and we find that the [PCRA] court erred in finding that counsel was effective.

*Id.* at 9. This Court also found that double jeopardy barred Payne's sentence for burglary, as he had already been convicted and sentenced for felony murder. *Id.* at 16. On remand, the trial court resentenced Payne, on July 5, 1994, for the unrelated robbery conviction.[8]

On June 14, 2012, Payne filed a *pro se* motion/petition titled "Post Conviction Relief Act petition seeking DNA testing pursuant to 42 Pa.C.S. § 9543.1" (hereinafter, "Payne's Petition for DNA Testing" or "the Petition").[9] The trial court[10] appoint-

---

6. Post Conviction Relief Act (PCRA), 42 Pa. C.S. § 9541 *et seq.*

7. Payne was convicted of robbery in an unrelated case.

8. While acknowledging that Payne's sentences for conspiracy and burglary had been vacated and declining (correctly) to reimpose sentence for those offenses, the trial court failed to acknowledge that Payne's sentence for conspiracy had not merely been vacated—the conviction itself had been reversed by this

Court's April 30, 1993 memorandum. *See* Order, 7/5/94, at 2.

9. Payne provided documentary evidence to the trial court, in the form of a prison postage slip dated February 9, 2012, demonstrating that he attempted to file the Petition on that date. However, that earlier petition was not docketed in the lower court. Numerous *pro se* letters from Payne subsequently appear in the docket prior to the June 14, 2012 refiling, in April, May, and early June of 2012, although those letters have not been preserved

ed counsel to represent him, and a hearing was held on the matter on February 19, 2013. Subsequently, on May 23, 2013, the trial court issued an order granting Payne's Petition for DNA Testing. The Commonwealth filed a timely notice of appeal from that order and filed a timely, court-ordered Pa.R.A.P. 1925(b) statement of errors complained of on appeal. The trial court issued its Rule 1925(a) opinion on August 15, 2013.

The Commonwealth's appeal was initially heard by a three-judge panel of this Court. In an unpublished memorandum, a majority of the panel affirmed on the basis of the trial court's Rule 1925(a) opinion, holding that the trial court's order granting DNA testing was supported by the evidence of record and free of legal error. The panel majority also opined that the trial court was presented with factors militating both in favor of and against DNA testing under the applicable standard, and the court had reasonably applied its discretion to grant testing in the circumstances of this case. *See In re: John Marshall Payne, III*, 1113 MDA 2013 (Pa.Super. filed October 3, 2014) (unpub-

lished memorandum) (withdrawn by order granting *en banc* review on December 16, 2014). One judge dissented, agreeing with the Commonwealth that the jury's verdict could withstand any possible result of DNA testing. *Id.* (J. Bowes dissenting). The Commonwealth subsequently filed a timely request for *en banc* argument, which was granted by *per curiam* order dated December 16, 2014. As a result of that order, the October 3, 2014 memorandum decision was withdrawn. Oral argument before the instant *en banc* panel occurred on June 29, 2015.

The Commonwealth now presents the following question for our review:

Whether the court below erred as a matter of law in determining that DNA testing would produce exculpatory evidence that would establish [Appellee]'s actual innocence?

Commonwealth's Resubmitted Brief ("Commonwealth's Brief"), 6/30/15, at 4 (unnecessary capitalization omitted).

■ "Post conviction DNA testing falls under the aegis of the [PCRA],[11]

---

by the clerk of courts in the certified record. The trial court does not address this matter in its Pa.R.A.P. 1925(a) opinion; however, the court proceeded as if Payne's petition was timely filed, and the Commonwealth does not contend otherwise in its brief to this Court.

10. This and all subsequent references to the "trial court" refer to the court that received and ruled upon Payne's Petition for DNA Testing unless otherwise specified.

11. Nevertheless, as this Court explained in *Commonwealth v. Williams*, 35 A.3d 44 (Pa.Super.2011), the PCRA's jurisdictional time-bar does not preclude a request for DNA testing made pursuant to Section 9543.1:

An application for DNA testing should be made in a motion, not in a PCRA petition. *Commonwealth v. Weeks*, 831 A.2d 1194, 1196 (Pa.Super.2003). Though brought under the general rubric of the PCRA, motions for post-conviction DNA testing are "clearly

separate and distinct from claims brought pursuant to other sections of the PCRA." *Commonwealth v. Perry*, 959 A.2d 932, 938 (Pa.Super.2008). This Court has consistently held the one-year jurisdictional time bar of the PCRA does not apply to motions for DNA testing under Section 9543.1. *Commonwealth v. Conway*, 14 A.3d 101, 108 n. 2 (Pa.Super.2011), *appeal denied*, ... 612 Pa. 687, 29 A.3d 795 (2011); *Perry, supra* at 938; *[Commonwealth v.] Brooks*, [875 A.2d 1141, 1146 (Pa.Super.2005)]. Another distinction of motions for DNA testing is that Section 9543.1 does not confer a right to counsel. *Brooks, supra* at 1147.

*Williams*, 35 A.3d at 50. Furthermore, Section 9543.1(f)(1) states:

After the DNA testing conducted under this section has been completed, the applicant may, pursuant to section 9545(b)(2) (relating to jurisdiction and proceedings), during the 60–day period beginning on the date on which the applicant is notified of the test

and thus, '[o]ur standard of review permits us to consider only whether the PCRA court's determination is supported by the evidence of record and whether it is free from legal error.'" *Conway,* 14 A.3d. at 108 (quoting *Brooks,* 875 A.2d at 1144). Additionally, where "the resolution of this appeal involves statutory construction, which involves a pure question of law, we review that aspect of the trial court's decision *de novo* and our scope of review is plenary." *Id.* Moreover, "the DNA testing statute, which was passed unanimously by the Pennsylvania General Assembly, should be regarded as a remedial statute and interpreted liberally in favor of the class of citizens who were intended to directly benefit therefrom, namely, those wrongly convicted of a crime." *Id.* at 113.

The pertinent statutory language at issue is as follows:

**(a) Motion.—**

(1) An individual convicted of a criminal offense in a court of this Commonwealth and serving a term of imprisonment or awaiting execution because of a sentence of death may apply by making a written motion to the sentencing court for the performance of forensic DNA testing on specific evidence that is related to the investigation or prosecution that resulted in the judgment of conviction.

(2) The evidence may have been discovered either prior to or after the applicant's conviction. The evidence shall be available for testing as of the date of the motion. If the evidence was discovered prior to the applicant's conviction, the evidence shall not have been subject to the DNA testing requested because the technology for testing was not in existence at the

: results, petition to the court for postconviction relief pursuant to section 9543(a)(2)(vi)

time of the trial or the applicant's counsel did not seek testing at the time of the trial in a case where a verdict was rendered on or before January 1, 1995, or the applicant's counsel sought funds from the court to pay for the testing because his client was indigent and the court refused the request despite the client's indigency.

. . .

**(c) Requirements.—**In any motion under subsection (a), under penalty of perjury, the applicant shall:

(1)(i) specify the evidence to be tested;

(ii) state that the applicant consents to provide samples of bodily fluid for use in the DNA testing; and

acknowledge that the applicant understands that, if the motion is granted, any data obtained from any DNA samples or test results may be entered into law enforcement databases, may be used in the investigation of other crimes and may be used as evidence against the applicant in other cases.

(2)(i) assert the applicant's actual innocence of the offense for which the applicant was convicted;

. . .

**(d) Order.—**

(1) Except as provided in paragraph (2), the court shall order the testing requested in a motion under subsection (a) under reasonable conditions designed to preserve the integrity of the evidence and the testing process upon a determination, after review of the record of the applicant's trial, that the:

(relating to eligibility for relief).

(i) requirements of subsection· (c) have been met;

(ii) evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been altered in any material respect; and

(iii) motion is made in a timely manner and for the purpose of demonstrating ·the applicant's actual ·innocence and not to· delay the execution of sentence or administration of justice.

(2) The court shall not order the testing requested in a motion under ·subsection (a) if, after·review of the record of the applicant's trial, the court determines that there is no reasonable possibility that the testing would produce exculpatory evidence that:

(i) would establish the applicant's actual· innocence ·of. the offense for which the applicant was convicted;

· · ·

42 Pa.C.S. § 9543.1 ("DNA Statute").

■■■■ The sole issue presented for our review concerns the application of the standard set forth in Section 9543.1(d)(2) and 9543.1(d)(2)(i).[12] Stated briefly, the time-bar and the DNA-testing provisions as follows:

> As we noted in *Commonwealth v. Weeks*, 831 A.2d 1194, 1196 (Pa.Super.2003), "Post conviction DNA testing does not directly create an exception to· § 9545's one-year time bar. *See* 42 Pa.C.S.A. § 9543.1. Rather it allows for a convicted individual to first obtain DNA testing which could then be used within a PCRA petition to establish new facts in order to satisfy the requirements of an exception under 42 Pa.C.S.A. § 9545(b)(2). *See* 42 Pa.C.S.A. § 9543.1(f)(1)." *Accord Commonwealth v. Scarborough*, [619] Pa. [353], 64 A.3d 602, 609 (2013) ("the litigation of a motion for DNA testing under Section 9543.1 is, in substance, a wholly separate proceeding from litigation. of a PCRA petition[]"); *Commonwealth v. Williams*, 35 A.3d 44, 50 (Pa.Super.2011) ("This Court has consistently held the one-year jurisdictional time bar of the PCRA does not apply to motions for DNA testing under Section 9543.1.").
>
> *Commonwealth v. Gacobano*, 65 A.3d 416, 419 (Pa.Super.2013) (footnote omitted).
>
> In *Edmiston*, our Supreme Court conducted a thorough jurisdictional-timeliness analysis of Edmiston's multiple PCRA petitions, but did not include in that discussion any reference to Section 9543.1(d)(1)(iii). *See Edmiston*, 65 A.3d at 345–353. After completing their analysis of Section 9545(b) issues, the Court then separately considered "[the a]ppellant's motion for post-conviction DNA testing pursuant to 42 Pa.C.S. § 9543.1." *Id.* at 353. The Court noted that· "the PCRA court first rejected the Commonwealth's argument that [the a]ppellant's petition was untimely

**12.** President Judge Gantman, writing in dissent, believes that we cannot reach this question because Payne "failed to establish the statutory timeliness of his petition as mandated by the DNA statute at 42 Pa.C.S.A. § 9543.1(d)(1)(iii) and our Supreme Court's decision in *Commonwealth v. Edmiston*, 619 Pa. 549, 65 A.3d 339 (2013). . . ." Dissenting Opinion (Gantman, P.J.), at 566. Notably, the Commonwealth has never asserted the untimeliness of Appellee's DNA testing petition based on Section 9543.1(d)(1)(iii) or *Edmiston*. It is certainly true that, with respect to the general timeliness provisions set forth in Section 9545(b) of the PCRA, this Court may raise, *sua sponte,* issues concerning the timeliness of a PCRA petition because "[t]he time requirements established by the PCRA are jurisdictional in nature; consequently, Pennsylvania courts may not entertain untimely PCRA petitions[,]" and "[w]hether [a petitioner] has carried his burden is a threshold inquiry prior to considering the ·merits of any claim." *Edmiston*, 65 A.3d at 346. However, neither the *Edmiston* decision, nor any other decision by a Pennsylvania Court to our knowledge, has ever referred to the timeliness requirements of Section 9543.1(d)(1)(iii) as being jurisdictional in nature, including the *Edmiston* decision itself. Simply put, the notion that the PCRA's timeliness requirements are jurisdictional in nature refers exclusively to the timeliness provisions · of Section 9545(b), and not to the separate matter of timeliness as set forth in Section 9543.1(d)(1)(iii).

This Court has previously discussed the relationship between the PCRA's jurisdictional

interplay between these provisions requires that DNA testing "shall not" be ordered by the PCRA court if there is "no reasonable possibility that the testing would produce exculpatory evidence" that "would establish . . . actual innocence of the offense for which the applicant was convicted."

Section 9543.1 frequently incorporates, yet fails to define, the term "actual innocence." In *Conway*, 14 A.3d at 109, this Court applied a definition of 'actual innocence' taken from "the United States Supreme Court in its Opinion in *Schlup v. Delo*, 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), namely, that the newly discovered [DNA] evidence must make it 'more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt.' "

Payne filed a *pro se* petition pursuant to Section 9543.1(a)(1) seeking DNA testing of several items collected from the scene of the December 1981 killing of Rishel. Specifically, Appellant sought testing of the following items, which have been retained and preserved by the F.B.I.:

- Brown head hairs exhibiting Caucasian characteristics found on Rishel's bedsheet and nightgown, which the F.B.I. determined did not match the victim.

under Section 9543.1(d)(1)(iii) . . . ." *Id.* at 355. Thus, clearly the issue of timeliness with respect to Section 9543.1(d)(1)(iii) had been preserved in the PCRA court by the Commonwealth. Later, the Court referenced that Section 9543.1(d)(1)(iii) was "implicated by the Commonwealth's argument in this case[,]" *strongly suggesting that the timeliness of the appellant's DNA petition pursuant to Section 9543.1(d)(1)(iii) was raised by the Commonwealth on appeal.*
The *Edmiston* Court went on to hold that: Although the PCRA court did not make the requisite finding of timeliness, we see no need to remand for the court to do so because, as explained below, our own review of the record and circumstances surrounding Appellant's post-conviction DNA testing request leads to the conclusion that this motion was untimely as a matter of law and was forwarded only to delay further the execution of the sentence. *Id.* at 357.
The above passage *does not* indicate that the Supreme Court addressed the timeliness of Edmiston's DNA-testing petition *sua sponte*, nor does it suggest that review of timeliness under Section 9543.1(d)(1)(iii) is a threshold, jurisdictional matter akin to the provisions of Section 9545(b). Instead, it is clear from the context of the decision that the *Edmiston* Court was responding to a specific argument raised by the Commonwealth on appeal that had been preserved before the PCRA court. The PCRA court had not addressed the timeliness of Edmiston's DNA-testing petition under Section 9543.1(d)(1)(iii), despite the Commonwealth's arguments specifically addressing that provision. Instead, the court denied Edmiston's DNA-testing petition on unrelated, "then-governing Superior Court precedent[,]" which was reversed by the Supreme Court *after* the PCRA court issued its order. *Id.* at 355.
In the present case, however, the PCRA court never addressed timeliness under Section 9543.1(d)(1)(iii) because the Commonwealth never raised the matter below. In any event, the Commonwealth, before us now as Appellant in this case, does not even present such a claim in their appeal. Consequently, the matter has clearly been waived. *See* Pa. R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). Indeed, even if the Commonwealth had no affirmative burden to directly raise this matter before the PCRA court in objection to Payne's Petition for DNA Testing, it certainly bore the burden of raising the Section 9543.1(d)(1)(iii) issue in its Rule 1925(b) statement, which it did not do. *See Commonwealth v. Lord*, 553 Pa. 415, 719 A.2d 306, 309 (1998) ("Any issues not raised in a 1925(b) statement will be deemed waived."). Given that we have no precedential authority that the requirements of Section 9543.1(d)(1)(iii) are jurisdictional in nature, or otherwise involve the illegality of a sentence, we may not raise such matters *sua sponte*, as President Judge Gantman suggests in her Dissenting Opinion.

- Numerous blood samples taken from various locations in Rishel's bed and bedroom.
- One brown pubic hair, exhibiting Caucasian characteristics, found on a blanket on the victim's bed.

Payne's Petition for DNA Testing, at 10 ¶ 10.

The trial court ultimately granted Payne's "request to perform DNA testing on the evidence listed" in the Petition. Trial Court Opinion (TCO), 5/22/13, at 2. In reaching that conclusion, the trial court dismissed the notion that the failure to match Payne's DNA to the tested materials would demonstrate his innocence. *Id.* at 9 ("It is entirely possible, through luck or concealment, that [Payne] left no DNA behind."). However, the court recognized that Payne's Petition for DNA Testing was not limited to that theory. Payne also presented a "data bank" theory as a basis for testing, as discussed in *Conway*. This theory "postulates that any DNA results that are obtained from DNA testing that prove the presence of an unknown person could be run through state and federal data banks for a match, which, if successful, would lead to the identification of a separate assailant[.]" *Conway*, 14 A.3d at 110.

Assuming exculpatory results under this "data bank" theory, *i.e.*, the discovery of a heretofore unknown assailant, the trial court next considered whether such results might demonstrate Payne's actual innocence. The trial court found that such a determination "turns upon the nature of the evidence offered at trial." TCO, at 10. After analyzing the weight of the trial evidence demonstrating guilt, the trial court concluded that "[a] jury might indeed have placed more emphasis on the weaknesses of [the] Commonwealth's case if there were DNA evidence introduced

and it did not directly tie [Payne] to the murder scene." *Id.* at 12.

The trial court then went on to offer a secondary, policy-based reason to conduct DNA testing in this case:

Considering all of the above that is both for and against testing, the very best reason to test the evidence is the fact that the witnesses who testified regarding confessions all agreed on one salient point, namely, that there were three individuals who perpetrated the robbery that night. As such, DNA testing, in this case, may result in additional charges and bringing to justice all guilty parties. Perhaps it would be a perversion of the PCRA statute, as it relates to DNA, if [Payne]'s request were to be granted, under the auspices of a statute designed to aid the wrongly convicted, in order to further [the] Commonwealth's own interests. However, it is curious indeed that [the] Commonwealth's position at [Payne]'s trial was that there were three intruders into the victim's home, but that no testing should be done on available evidence when two of those intruders remain unknown and potentially on the loose. In point of fact, were the Commonwealth to appeal a ruling in favor of testing it might be inadvertently aiding other perpetrators to escape culpability.

TCO, at 12–13.

Presently, the Commonwealth argues that the trial court erred in granting Payne's Petition for DNA Testing:

In the instant case, [Payne] advanced two arguments in the court below for establishing his actual innocence: (1) there will be a lack of DNA evidence tying [him] to the murder, and such absence of evidence will prove that he was not present at the crime scene; and (2) DNA testing will establish the identity of the actual assailant thereby elimi-

nating [Payne] as the assailant. The Commonwealth maintains that both arguments are flawed and do not mandate the granting of DNA testing. Commonwealth's Brief, at 19.

■ The first scenario addressed by the Commonwealth concerns a potential result of DNA testing that merely demonstrates the absence of Payne's DNA in the tested materials. The Commonwealth argues that such a result—the mere absence of the accused's DNA—would never justify DNA testing under Section 9543.1. We agree with the Commonwealth that this Court has routinely held that the absence of the accused's DNA, *by itself*, cannot satisfy Section 9543.1(d)(2)(i)'s "actual innocence" standard.

For instance, in *Commonwealth v. Heilman*, 867 A.2d 542, 547 (Pa.Super.2005), the victim, Tamara Scott, died in 1987 from three gunshot wounds to her head. *Id.* at 543. Initially, Heilman and Jerry Dixon told police that Alex Dean had killed her. *Id.* Later, Dixon recanted his statement, and revealed "that he and [Heilman] concocted the story blaming Mr. Dean while Heilman and Dixon were incarcerated together in the Allegheny County Jail[.]" *Id.* The "true" story, Dixon testified, was that while "acting as [a] jitney driver, [Dixon] took [Heilman] and Ms. Scott, who was a prostitute picked up by [Heilman] in the downtown section of the city, to a parking lot on the northside of the city. [Heilman] and Ms. Scott exited the vehicle and went behind a building. A short time later, Mr. Dixon heard gun shots and [Heilman] returned to the vehicle alone." *Id.* at 544. [Heilman] was convicted of criminal homicide and gun charges. For those offenses, Heilman was sentenced in 1990.

In 2003, Heilman appealed from the trial court's denial of his motion for DNA testing filed pursuant to Section 9543.1. On appeal, this Court noted that Heilman's "entire argument depend[ed] on th[e] premise" that "an absence of DNA evidence would conclusively absolve him of culpability." *Id.* at 545. Specifically, Heilman argued that " '[t]he killer obviously beat the victim about her face and then shot her at close range' and 'obviously had sex with her ... before he killed her,' " and thus Heilman "insist[ed] that if he had murdered the victim, 'his DNA would have been all over that crime scene (including the victim's body and her clothing).' " *Id.* at 546. However, the trial court rejected his argument, noting that even if semen not belonging to Heilman were found in any of the evidence collected from the victim or her clothing, the fact that the victim was a prostitute precluded such evidence from effectively demonstrating Heilman's "actual innocence." *Id.*

This Court agreed and affirmed the trial court's denial of Heilman's request for DNA testing, reasoning:

Although we have already acknowledged ... the paucity of precedent on the question presented, that does not free Heilman from the obligation to provide more than a bald assertion based on an unintuitive scientific premise. On its face, the *prima facie* requirement set forth in § 9543.1(c)(3) and reinforced in § 9543.1(d)(2) requires an appellant to demonstrate that favorable results of the requested DNA testing "would establish" the appellant's actual innocence of the crime of conviction. Heilman has failed to make such a demonstration, nor could he. In DNA as in other areas, an absence of evidence is not evidence of absence. Furthermore, a murder suspect may be convicted on wholly circumstantial evidence, of which there was plenty in this case.

*Id.* at 546–47. There was no evidence that Scott's killer had intercourse with her pri-

or to shooting her three times in the head, nor was there evidence that Scott struggled with her assailant before she was killed. Thus, the absence of Heilman's DNA in, on, or about the victim's body and/or the crime scene was inconsequential in the context of the facts supporting his conviction in that case.

Similarly, in *Commonwealth v. Smith*, 889 A.2d 582, 586 (Pa.Super.2005), we stated that "the absence of [the] appellant's DNA [in or on the evidence to be subjected to testing] cannot be meaningful and cannot establish his actual innocence of the murder." Smith sought Section 9543.1 DNA testing of his victim's fingernails, hoping to demonstrate the absence of his own DNA or the presence of another's. However, there was "no evidentiary basis on which to infer that any DNA detected on the victim's fingernails was deposited there by her assailant during the fatal attack." *Id.* at 585. Thus, the absence of Smith's DNA could not be meaningful where he could not establish any evidentiary basis upon which to believe that the victim's assailant's DNA *should* be in, on, or about the evidence available for testing.

In *Brooks*, the appellant was convicted of killing the victim, Ethel Mumma, who was shot in the head and stomach. *Brooks*, 875 A.2d at 1146. In his Section 9543.1 petition, Brooks sought testing of "blood found on any of the blood stained material, including hair fibers or skin tissue which may have been found or [were]

found on the victim or victim's clothing." *Id.* However, no evidence of record supported the contention that the perpetrator had left behind biological material. *Id.* at 1147. Relying on *Heilman*, the *Brooks* Court concluded that "even if [the] appellant's DNA was not at the crime scene, it would prove nothing." *Id.*

 Thus, as *Heilman, Smith*, and *Brooks* demonstrate, this Court has consistently held that the absence of a petitioner's DNA, *by itself*, cannot demonstrate "actual innocence" for purposes of Section 9543.1(d)(2)(i). Yet, the quantum of evidence necessary to satisfy Section 9543.1(d)(2)(i) above and beyond the absence of the petitioner's DNA has never been explicitly defined.[13] In this regard, we are not aware of any authority that holds or suggests that demonstration of "actual innocence" under Section 9543.1(d)(2)(i) *requires* a discovery of DNA from someone other than the petitioner. Instead, the quantum of evidence necessary to satisfy Section 9543.1(d)(2)(i) above and beyond the absence of the petitioner's DNA has been, and should continue to be, determined on a case-by-case basis, as circumstances dictate. Such circumstances might include the presence of another person's DNA, but not necessarily so. It is at least conceivable that certain circumstances or facts, in addition to or in conjunction with the absence of the petitioner's DNA in a particular location, may satisfy Section 9543.1(d)(2)(i).[14] However,

---

13. In most circumstances, the presence of a petitioner's DNA in the tested evidence will have an inculpatory effect. However, it would be improper to state any absolute rule, as it is plausible that the presence of a petitioner's DNA in, on, or about specific evidence could serve an exculpatory purpose in rare circumstances, such as where the presence of the petitioner's DNA in one location (and deposited at a certain time) would make

it impossible for the petitioner to be present to commit a crime at a different location.

14. We alluded to such circumstances in *Brooks*, noting: "This is not a rape-murder case where the absence of the defendant's semen could prove his innocence; or a case where there were signs of a struggle and the perpetrator left behind skin, hair, or blood samples." *Brooks*, 875 A.2d at 1147. The absence of DNA evidence in a location where it is reasonably expected to be found has

to the extent that the Commonwealth as- serts that the absence of Payne's DNA on the items to be tested would not, by itself, establish a *prima facie* case that he is actually innocent, we agree. Additionally, there are no circumstances in this case that, in combination with the absence of Payne's DNA in a specific location, would demonstrate his actual innocence.

However, Payne did not merely suggest in the Petition that the absence of his DNA on the items to be tested would, by itself, demonstrate his actual innocence of the crime for which he was convicted. While he does assert that the absence of his DNA would be exculpatory, he also asserts that DNA testing might reveal the identity of the person who actually killed the victim. Payne's Petition for DNA Testing, at 4–5 ¶ 2 ("Here, Petitioner John Payne asserts that the requested DNA evidence would show the absence of his DNA but Petitioner Payne says more. Petitioner avers that comparison of the DNA profile to state and national databas- es would reveal the identity of the likely killer.") (emphasis omitted).

The Commonwealth argues Payne's "data bank" theory still fails to meet his burden under the DNA Statute because he was convicted as a member of a conspiracy to burglarize the victim's home. In this regard, the Commonwealth contends that "[a]ny evidence produce by DNA testing that revealed the presence of a person other than [Payne] at the crime scene would not establish [Payne]'s innocence be- cause inherent in the juror's verdict was a finding that there were others besides [Payne] who were involved in the killing of Elsie Rishel." Resubmitted Appellate Brief for the Commonwealth (hereinafter "Commonwealth's Brief"), at 15. Explain- ing further, the Commonwealth states:

> profoundly different implications than does the failure to discover DNA evidence in a

[Payne]'s second argument rests on the "data bank" theory discussed in ... *Conway.* ... In *Conway*, this Court ex- plained that the "data bank" theory rests on the assertion that "that any DNA results that are obtained from DNA testing that prove the presence of an unknown person could be run through state and federal databanks for a match, which, if successful, would lead to the identification of a separate assail- ant." [*Conway* ], 14 A.3d at 110. What [Payne]'s argument overlooks is the fact that [he] was convicted of criminal con- spiracy, meaning jurors specifically found that [Payne] acted in concert with other individuals to commit the crime of felony murder. The Commonwealth's theory, supported by three witnesses who testified that [Payne] confessed to committing the killing with two accom- plices, was that there were three intrud- ers into the victim's home. Thus, even if DNA testing identified one of [Payne]'s two accomplices, those test re- sults would not establish [Payne]'s actu- al innocence, because [Payne]'s guilt was predicated on the possibility that evi- dence linking others to the scene might exist. The court below rejected that aspect of [Payne]'s argument, too. ...

Commonwealth's Brief, at 20–21.

We disagree. The Commonwealth's the- ory, despite significantly narrowing the ar- ray of potentially exculpatory results from DNA testing, is not completely dispositive of Payne's request for DNA testing, as discussed below. First, the applicability of the Commonwealth's theory to the instant case is questionable since this Court re- versed Payne's conviction for conspiracy in 1993. *See Commonwealth v. John M. Payne,* No. 00581 Harrisburg 1992, unpub-

> location where no such reasonable expecta- tion can be articulated.

lished memorandum at 9–10, 431 Pa.Super. 621, 631 A.2d 216 (filed April 30, 1993) (finding trial counsel ineffective for failing to seek to quash the conspiracy charge due to the then-in-effect statute of limitations). As such, it is simply disingenuous for the Commonwealth to rely upon the jury's specific findings regarding Payne's participation in a conspiracy when Payne's conviction for that crime was overturned after that verdict was issued. Furthermore, if the Commonwealth were to retry Payne in this case, it will be precluded from charging him with conspiracy on double jeopardy grounds. Thus, the Commonwealth's theory—that the identification of an unexplainable DNA profile in the tested evidence would not serve to demonstrate Payne's actual innocence *because of his conspiracy conviction*—appears to fail on its face in the context of this case. Moreover, the Commonwealth has simply not offered any basis upon which to suggest that this Court can simply ignore that Payne's conspiracy conviction no longer stands.

Second, even if Payne's conspiracy conviction survived, the Commonwealth's claim must fail.[15] The Commonwealth's argument too narrowly construes the nature of Payne's claim of innocence, in effect suggesting that Payne is only challenging his conviction for murder, but not his culpability as an accomplice or a co-conspirator to burglary. However, Payne has asserted his actual innocence for all offenses for which he was convicted in this case. The Commonwealth argues that Payne can never demonstrate actual innocence because of his conspiracy and/or accomplice-to-burglary convictions, but fails

to explain why or how those underlying offenses are immune from scrutiny given certain exculpatory DNA results (notwithstanding the fact that Payne's conviction for conspiracy has already been overturned). Payne has maintained consistently that, not only did he not kill Rishel, but that he was not a participant in the burglary of her home. Without a doubt, results of DNA testing that merely show that Payne did not leave his DNA at the crime scene, in the absence of any other evidence, would not entitle him to a new trial. However, the question before the trial court was whether to grant Payne's Petition for DNA Testing, which demands an inquiry into whether there is "no reasonable possibility that the testing would produce exculpatory evidence to establish petitioner's actual innocence[,]" *Smith*, 889 A.2d at 584, not whether a particular result, or category of results, would entitle him to a new trial. As discussed below, the Commonwealth appears to consider only potential results of DNA testing that are, in the context of the specific facts of this case, not exculpatory. However, the statute itself dictates that the trial court *assume* exculpatory results in evaluating a petition for DNA testing. *Conway*, 14 A.3d at 110 ("[T]he statutory language requires reviewing courts to evaluate the 'actual innocence of the offense' component by 'assuming exculpatory results' will be obtained from the proposed testing."); 42 Pa.C.S. § 9543.1(c)(3)(ii).

Third, the Commonwealth does not adequately explain why DNA testing that shows an unexplained DNA profile (or profiles) in the victim's bed would only serve

---

15. We provide an alternative analysis out of an abundance of caution. Although the "actual innocence" standard is not to be taken literally, it is apparent that Payne's conviction for conspiracy was not reversed on its merits, but instead due to the Commonwealth's failure to try him within the then-applicable statute of limitations. Furthermore, Payne might have been convicted of second-degree murder as an accomplice to the underlying burglary even in the absence of a conspiracy conviction.

to attack Payne's identity as the actual killer, but not his identity as a co-conspirator or accomplice to the crime of burglary. It is not beyond the realm of imagination that certain results could also undermine the Commonwealth's theory that Payne acted as an accomplice. Here, the most powerful evidence of Payne's guilt of all offenses was his purported confessions to Wallick, Oglesby, and Gibson. Through the testimony of those three individuals, it was established that Payne had acted with the help of two accomplices or co-conspirators, but no independent physical or circumstantial evidence of multiple burglars corroborates their testimony. Wallick was unaware of the accomplices' names, but believed that Payne had told her the accomplices were two men. Payne purportedly told Oglesby that his accomplices were a man named Danny Edwards and Payne's ex-girlfriend, Melody. Gibson's testimony established that Payne had two accomplices, one of which was named "Danny."

Thus, there are a limited number of potential DNA profiles that would tend to outright support the Commonwealth's case against Payne. First, and most obviously, would be the discovery of Payne's DNA profile in the evidence to be tested. Second, discovery of the DNA profile of Danny Edwards and/or "Melody" would, in the context of the Commonwealth's evidence, not tend to prove Payne's actual innocence. Third, if testing of the head and pubic hairs results in matches to the victim's close relatives, or other persons with routine access to her home, such evidence would also be difficult to construe as exculpatory.[16]

However, these scenarios are not the only possible results of DNA testing. It is not difficult to imagine, however unlikely, results that could deal a devastating blow to the soundness of the jury's verdict in this case, including whether or not there were multiple burglars—a fact entirely dependent on the credibility of Wallick, Oglesby, and Gibson. If testing were to reveal the DNA profiles of Wallick, Oglesby, and/or Gibson, such results would not only be exculpatory, but could serve to completely undermine the Commonwealth's case against Payne. Similarly, if the DNA results were to match some heretofore unknown culprit with a history of burglary-murders which bear a striking resemblance to the killing of Rishel, and further investigation reveals that person had the opportunity to commit this crime, such results could easily allow Payne to demonstrate the unreliability of the jury's verdict *in toto*.[17] The Commonwealth's argument, while internally consistent given a relatively narrow scope of potential outcomes considered, simply ignores other potential outcomes that could permit Payne to demonstrate a *prima facie* case that he is actually innocent.

16. The Commonwealth might find it more difficult to explain the presence of a close relative's DNA profile in the blood samples taken from Rishel's bed.

17. There were some facts in this case that tended to support a theory that there was a single individual responsible for the murder of Rishel and the burglary of her residence. For instance, there was only one set of footprints in the snow leading to the broken window that was assumed to be the point of the illegal entry into her home. There was only one set of footprints left in the snow leading away from Rishel's home. The *only* evidence of multiple culprits derives from Payne's purported confessions to Wallick, Oglesby, and Gibson. Not only is there an absence of physical evidence connecting Payne to these crimes, there is an absence of any evidence demonstrating that these crimes were committed by more than one person apart from Payne's purported confessions to Wallick, Oglesby, and Gibson.

We must emphatically state that, with respect to the burden on a Section 9543.1 petitioner, "no reasonable probability" does not mean, "no likely probability." It should go without saying that the most *likely* result of Section 9543.1 DNA testing will corroborate a petitioner's guilt, confirm it outright, or simply fail to cast significant doubt on the verdict. However, the very purpose of Section 9543.1 must be to afford a petitioner the *opportunity* to demonstrate the unlikely.[18] The threshold question is, therefore, not the likelihood of proof of innocence, but whether it is within the realm of reason that some result(s) could prove innocence. In *Heilman*, *Smith*, and *Brooks*, this Court sensibly determined that it was simply not reasonable to believe that any DNA test results, even those presumed to be exculpatory, could demonstrate a *prima facie* case of actual innocence of those Section 9543.1 petitioners.

In *Conway*, by contrast, this Court reached a different result. Conway was convicted of stabbing Michele Capitano to death in 1986. Stated briefly, on the day of the murder, Conway left his home to run some errands for himself and his wife. He returned home 90 minutes later and told his wife he had discovered a body at a local surgical supply store. The victim had been raped and murdered. Conway told her that he attempted to untie the bound victim, but after failing in that attempt, he returned home before notifying authorities of his gruesome discovery. Conway was charged and ultimately convicted of killing Capitano based upon numerous suspicious circumstances. Years later, Conway sought testing under Section 9543.1 of several items preserved from the crime scene.[19] The trial court denied his request, but this Court reversed that decision on appeal.

With regard to its analysis under Section 9543.1, the *Conway* Court pointed to the following "salient" facts:

- [Conway] was convicted solely on circumstantial evidence.

- [Conway] does not deny that he was present at the murder scene—in fact he claims to have discovered the body, and subsequently advised his wife to report the crime to the police.

- [Conway], on the day of the homicide, provided a statement to the police in which he admitted touching the body

18. The experiences of *Amici Curiae*, The Pennsylvania Innocence Project, and The Innocence Project, emphasize this point. Since 1989, *Amici Curiae* report that "at least 329 wrongfully convicted people have been exonerated and released from prison on the strength of post-conviction DNA testing." Brief of *Amici Curiae*, at 8–9 (footnote omitted). "Many of the 329 DNA exonerees were convicted on evidence far more "overwhelming" than that used to convict Mr. Payne; yet through DNA testing those men and women were able to show to a scientific certainty they were not guilty of the crimes for which they were convicted." *Id.* at 9. In nearly half of those cases, DNA testing resulted in identification of the actual perpetrator. *Id.* As is particularly pertinent to the present case, "in about 25% of DNA exoneration cases, innocent defendants made incriminating statements, delivered outright confessions, or pled guilty. Additionally, incentivized testimony—including particular incentives that are not disclosed to the jury—were critical evidence used to convict an innocent person in more than 15% of wrongful conviction cases." *Id.* at 10 (footnotes omitted).

19. Conway sought testing of:

[B]lood-stained paper towels found near the victim; fingernail clippings from the victim's hands, a piece of blue cloth that had been tied around the victim's hands; rape kit samples; the victim's blood-stained lab coat, the victim's blood-stained dress; the victim's blood[-]stained half slip, the victim's blood-stained brassiere, the victim's pantyhose, and the victim's purse and contents thereof.

*Conway*, 14 A.3d at 107–08.

564

of the deceased victim for the purpose of determining whether she was alive.

- The Commonwealth did not introduce any DNA or other scientific evidence tying [Conway] to the body of the victim or the location—specifically the bathroom—where the body was discovered.

*Conway,* 14 A.3d at 109.

Conway advanced three theories of why DNA testing was warranted under Section 9543.1:

(1) a "redundancy" theory, which postulates that if the individual DNA tests reveal evidence of a third person on multiple items connected with the crime, then those "redundant" results would give rise to an inference of a separate assailant; (2) a "data bank" theory, which postulates that any DNA results that are obtained from DNA testing that prove the presence of an unknown person could be run through state and federal data banks for a match, which, if successful, would lead to the identification of a separate assailant; and (3) a "confession" theory, which postulates that an assailant who is discovered by using the data bank theory could, when confronted with the DNA evidence, confess to the crime.

*Id.* at 110.

The Commonwealth countered that testing would be inappropriate because 1) "any results produced by DNA testing would be too 'speculative,'" and 2) the "overwhelming" nature of the circumstantial evidence. *Id.* The *Conway* Court quickly rejected the second aspect of the Commonwealth's argument, stating that the "relative weight of the Commonwealth['s] circumstantial evidence would obviously be outweighed by the discovery of relevant DNA evidence constituting substantial direct evidence of the identity of a separate assailant." *Id.*

Next, the *Conway* Court addressed the Commonwealth's speculative-results argument, which included the Commonwealth's assertion that Conway's "data bank" theory had been held in *Smith* to be unavailable to Section 9543.1 petitioners. The *Conway* Court rejected that interpretation of *Smith.* The *Conway* panel instead determined that the *Smith* Court's holding was "clearly grounded in the facts of that case" and was not a precedential foreclosure on all future "data bank" theory claims. *Id.* at 112 ("[T]his Court's perfunctory dismissal of the data bank argument in *Smith,* was not the precedential holding of that case. Rather, it was a *sui generis* rejection of an alternative argument offered by that defendant, and its impact should be confined to the facts and circumstances of that case.")

The *Conway* Court went on to examine the specific facts of that case, as well as overarching policy considerations, in concluding that Conway was entitled to DNA testing:

Here, ... the evidence produced at trial, with the exception of the testimony of the jailhouse informant, was wholly circumstantial, and there was no prior history between the parties that would have suggested the occurrence of the violent incident that resulted in the decedent's death. Moreover, the victim's hands were tied with a cloth that would have most likely been in contact with the assailant's hands, and her clothing was ripped in such a way that indicated extensive contact with the hands of her assailant. Additionally, the investigators at the scene collected a multitude of sample material from the victim under the belief that she may have had contact with the skin of her assailant. Thus, there is no question that the development of additional evidence—evidence that can be easily obtained by DNA testing—will add to the reliability of the reconstruction of the events of that tragic day.

The question that we must here confront is whether, in this situation, the Pennsylvania DNA testing statute should be interpreted in such a way as to prevent the comparison of easily obtainable test results with known data banks for the purpose of determining the person responsible for the crime in question. To pose the question is to provide the answer, for in this evolving world of increased DNA data collections, and the increased reliance thereon by law enforcement agencies, we should not summarily preclude defense counsel from using the data compiled in those "banks" to argue, in appropriate cases, that such evidence establishes the innocence of a person who has been charged or convicted of a crime. This is especially so since the Act specifically provides for the proactive use of this information by the Commonwealth in an effort to find and prosecute persons whose identities are revealed by this information.

*Id.* at 112–13.

As was the case in *Conway*, there is a complete lack of physical evidence tying Payne to the crime scene. However, in comparison to *Conway*, there is far less circumstantial evidence suggestive of Payne's guilt than there was circumstantial evidence suggestive of Conway's guilt. The strength of the Commonwealth's case in this matter rested on the credibility of three witnesses to Payne's confessions. Yet, in *Conway*, there was also a jailhouse informant who purportedly overheard Conway admit to killing the victim. All in all, the weight of the evidence in *Conway* demonstrating Conway's guilt appears at least as great, if not greater, than the weight of evidence of Payne's guilt in this matter.[20]

As in *Conway*, too, there is clearly some evidence available in this case for testing

20. We are not at all dissuaded by the fact that Payne's inculpatory statements included a fact—regarding the use of the telephone as a murder weapon—that was not a fact made public by the investigators. While that fact clearly bolstered the weight of Payne's purported confessions to Wallick, Oglesby, and Gibson, it is not above scrutiny, as this Court's unfortunate experience in *Commonwealth v. Godschalk*, 451 Pa.Super. 425, 679 A.2d 1295 (1996), demonstrates. In that rape and burglary case, we rejected Godschalk's request for DNA testing because his "conviction rest[ed] largely on his own confession which contain[ed] details of the rapes which were not available to the public." *Godschalk*, 679 A.2d at 1297.

Subsequent DNA testing granted by the federal courts demonstrated the narrow-mindedness of that decision. As *Amici Curiae* explain:

On appeal to federal court, Mr. Godschalk alleged that the Commonwealth violated his constitutional rights by denying him DNA testing. *Godschalk v. Montgomery District Attorney's Office*, 177 F.Supp.2d 366, 369 (E.D.Pa.2001). The District Court granted Mr. Godschalk's motion for summary judgment noting,

[I]f by some chance no matter how remote, DNA testing on the biological evidence excludes plaintiff as the source of the genetic material from the victims, a jury would have to weigh this result against plaintiff's uncoerced detailed confessions to the rapes. While plaintiff's detailed confessions to the rapes are powerful inculpatory evidence, so to any DNA testing that would exclude plaintiff as the source of the genetic material taken from the victims would be powerful exculpatory evidence. [...] Such contradictive results could well raise reasonable doubts in the minds of jurors as to plaintiff's guilt. **Given the well-known powerful exculpatory effect of DNA testing, confidence in the jury's finding of plaintiff's guilt at his past trial, where such evidence was not considered, would be undermined.**

*Id.* (emphasis added). When that testing took place, the results fully exonerated Mr. Godschalk. The DNA testing revealed that police suggested facts to Mr. Godschalk—whether intentionally or negligently—which bolstered the reliability of his "confession." Mr. Godschalk's exoneration occurred in

that could point to the identity of Rishel's assailant. Particularly, the hairs discovered in Rishel's bed are already known not to belong to her. Thus, the facts of the present case appear to offer at least as good an argument for testing as was presented in *Conway*. In this regard, this case bears a far closer resemblance to the facts of *Conway* than it does to *Heilman*, *Smith*, and *Brooks*. Accordingly, we conclude that the trial court's decision to grant DNA testing pursuant to Section 9543.1 was supported by the evidence of record.

The essence of the Commonwealth's claim in this matter is ultimately, therefore, a legal question. The Commonwealth's argument/theory is that based on conspiracy or accomplice-based liability, the presence of another assailant in this case cannot demonstrate Payne's actual innocence. As discussed above, the Commonwealth's argument in this regard is simply overstated. While Appellant's felony murder conviction certainly limits the array of DNA testing results that could assist in proving his innocence, it does not exclude them all. Accordingly, we conclude that the trial court's decision was also free of legal error.

Order *affirmed*.

Judges PANELLA, DONOHUE, SHOGAN, LAZARUS and MUNDY join this opinion.

President Judge GANTMAN files a dissenting opinion in which Judge STABILE concurs in the result.

Judge STABILE files a dissenting opinion in which President Judge GANTMAN concurs in the result.

Judge ALLEN did not participate in the consideration or decision of this case.

2002—the same year the Pennsylvania Legislature passed the DNA Statute.

**DISSENTING OPINION BY GANTMAN, P.J.:**

I agree with the dissenting opinion which holds that Mr. Payne failed to set forth a *prima facie* case of actual innocence under the facts of this case. I write separately to highlight that Mr. Payne also failed to establish the statutory timeliness of his petition as mandated by the DNA statute at 42 Pa.C.S.A. § 9543.1(d)(1)(iii) and our Supreme Court's decision in *Commonwealth v. Edmiston*, 619 Pa. 549, 65 A.3d 339 (2013), *cert. denied*, —— U.S. ——, 134 S.Ct. 639, 187 L.Ed.2d 423 (2013). Therefore, I respectfully dissent on this ground as well.

The relevant facts and procedural history of this case are as follows. Around 9:00 p.m. on December 17, 1981, family members of Victim found Victim dead in her bed. Victim was ninety years' old at that time. Victim's family members discovered Victim with the covers pulled up over her body and a pillow over her head. When family members removed the covers and pillow, they saw Victim's head and face were covered with blood. Family members noticed several objects in Victim's bedroom had been moved, closet doors and drawers were pulled open and appeared to have been rummaged through, and Victim's jewelry was strewn around the room. Victim usually slept with the telephone on her bed so she could quickly call her family in case of an emergency. When family members discovered Victim, the telephone was not in its usual place on the bed but on the nightstand next to Victim's bed. Victim's glasses were also not in their usual spot. Additionally, family members saw a broken window downstairs. According to Dr. Joan W. Gibble (pathologist), Victim

Brief of *Amici Curiae*, at 8–9 (footnotes omitted).

suffered multiple blows to her head with a firm instrument; the blow to the right side of Victim's head caused her death. Dr. Gibble opined Victim's injuries were consistent with being stuck with a telephone.

Officer Kenneth Miller and Detective Robert Harman (among others) responded to the crime scene. Officer Miller also noticed the drawers in Victim's bedroom appeared to have been ransacked, closet doors were open, paper was strewn about, and a window downstairs had been broken. Officer Miller and another sergeant processed the items they thought might contain fingerprints. Officer Miller used a special evidence vacuum cleaner; police retain as evidence anything collected in the vacuum cleaner and process the evidence for fingerprints. Importantly, police sent all physical evidence collected from the crime scene to the Federal Bureau of Investigation ("FBI") for testing and examination. No physical evidence found at the crime scene produced a suspect.

In March 1983, Officer Daniel Garber was investigating an unrelated case. Mr. Payne was assisting Officer Garber with his investigation. During a meeting on March 25, 1983, Mr. Payne mentioned that a state trooper was accusing him of beating a 90-year-old woman to death with a telephone. Officer Garber related Mr. Payne's comment to Detective Harman. Notably, prior to 1983, police had not disclosed the suspicion that a telephone was the potential murder weapon in Victim's case.

In August 1983, police received further information from Deborah Wallick about Victim's murder. Ms. Wallick informed police Mr. Payne had told her that he and two others went to rob Victim's house on the night in question. Mr. Payne heard a noise from the bedroom and, when he went to the bedroom, he saw Victim being beaten with a telephone. Mr. Payne told Ms.

Wallick he ran from the crime scene and thought Victim was dead. Ms. Wallick said Danny Everett was also involved in the crimes.

Sonny Olgesby, an inmate in York County prison, supplied police with more information about Victim's case. Mr. Olgesby informed Detective Harman that on December 24, 1985, Mr. Payne had told Mr. Olgesby about a lady who was murdered and asked Mr. Olgesby what Mr. Payne could do to avoid conviction. Mr. Payne then admitted his involvement in the crimes. Mr. Payne said he needed money, so he, his girlfriend Melody, and a friend Danny (last name Edwards or Everett, nicknamed "Dago") decided to rob Victim. Mr. Payne admitted he beat Victim to death.

The Commonwealth subsequently charged Mr. Payne with murder and related offenses. Several days before Mr. Payne's jury trial was to begin, Christopher Gibson, an inmate in York County prison, told police he had additional information about Victim's case. Mr. Gibson related that on August 15, 1986, at approximately 7:30 p.m., Mr. Gibson was in the prison law library when Mr. Payne approached him and asked what Mr. Gibson thought about his case and about making it look like Victim's grandson had committed the murder. During this conversation, Mr. Payne disclosed that he and two others (one person named Danny and the other possibly named Rick) committed the murder, but Mr. Payne was confident the Commonwealth lacked sufficient evidence to prove his guilt. Mr. Payne stated he did not plan to kill Victim, as he believed no one was home on the night of the robbery. Mr. Payne admitted he struck Victim with a telephone, but he just thought she was "knocked out." Mr. Payne also disclosed he broke a window in Victim's house to gain entry. Additionally,

Mr. Gibson revealed that Mr. Payne previously asked Mr. Gibson if he knew anyone who would be willing to say Mr. Payne had worked for him in December 1981 or January 1982, so Mr. Payne could prove he was working at that time and had a source of income.

Mr. Payne proceeded to a jury trial on August 20, 1986. The Commonwealth presented testimony/evidence from, *inter alia*, Victim's family members, Dr. Gibble, the investigating police officers/detectives, Ms. Wallick, Mr. Olgesby, and Mr. Gibson. Officer Miller and Detective Harman testified about their roles and actions in the investigation of Victim's case. Both officers testified that all physical evidence collected at the crime scene was submitted to the FBI for testing and examination; and **no physical evidence connected Mr. Payne to the crimes.**[1] Ms. Wallick, Mr. Olgesby, and Mr. Gibson each testified as to Mr. Payne's respective admissions of guilt. Defense counsel thoroughly and vigorously cross-examined these three witnesses. During his cross-examination of Ms. Wallick, defense counsel established Ms. Wallick was a heavy LSD drug user at the time she approached police with Mr. Payne's confession, which sometimes interfered with her perception. Defense counsel also elicited testimony from Ms. Wallick about her previous conviction for hindering apprehension or prosecution.

During cross-examination of Mr. Olgesby, defense counsel elicited testimony that Mr. Olgesby was facing the death penalty in an unrelated homicide case; Mr. Olgesby had negotiated a plea deal with the Commonwealth in which he could plead guilty to third-degree murder (and avoid the death penalty), in exchange for his testimony against two individuals involved in his own case and for his testimony against Mr. Payne. During cross-examination of Mr. Gibson, defense counsel attacked the witness' credibility by establishing Mr. Gibson had prior convictions for theft and burglary. Mr. Gibson also conceded he had negotiated a plea deal with the Commonwealth in which Mr. Gibson could plead guilty to theft (reduced from a robbery charge) and receive a county sentence in exchange for his testimony against Mr. Payne. Following Mr. Gibson's testimony, the Commonwealth rested its case.

In his defense, Mr. Payne presented testimony from several witnesses to refute the testimony of Ms. Wallick, Mr. Olgesby, and Mr. Gibson. Mr. Payne also presented testimony from Melody Codora (Mr. Payne's girlfriend at the time of the crimes) and Daniel Everett, whom the Commonwealth witnesses had mentioned as Mr. Payne's possible cohorts. Both witnesses denied their participation in the crimes. Mr. Payne also testified in his own defense. Mr. Payne maintained he had no involvement in the crimes charged and was not present at the crime scene. Mr. Payne also denied having made any admissions/confessions to Ms. Wallick, Mr. Olgesby, or Mr. Gibson.

On August 22, 1986, the jury convicted Mr. Payne of second-degree murder, burglary, aggravated assault, and criminal conspiracy.[2] On March 23, 1987, the court sentenced Mr. Payne to life imprisonment for the felony murder conviction; the court imposed consecutive sentences of two to four years' imprisonment each for the burglary and conspiracy convictions.[3] Addi-

---

1. Detective Harman also testified that no physical evidence connected Daniel Everett to the crimes.

2. The jury acquitted Mr. Payne of first-degree murder.

3. The aggravated assault conviction merged with felony murder.

tionally, the court sentenced Mr. Payne on an unrelated robbery conviction to two to four years' imprisonment, consecutive to his sentence for second-degree murder but concurrent to his sentences for burglary and conspiracy. This Court affirmed Mr. Payne's judgment of sentence on February 29, 1988, and our Supreme Court denied allowance of appeal on January 23, 1991. *See Commonwealth v. Payne,* 377 Pa.Super. 655, 541 A.2d 1153 (1988).

On June 7, 1991, Mr. Payne filed his first petition under the Post Conviction Relief Act ("PCRA");[4] Mr. Payne expressly established his intent to proceed *pro se.* In his PCRA petition, Mr. Payne asserted, *inter alia,* prior counsel was ineffective, Mr. Payne's sentence was illegal, and the Commonwealth committed gross prosecutorial misconduct by withholding exculpatory evidence. As to this last claim, Mr. Payne specifically alleged the Commonwealth had submitted for testing certain physical evidence found at the crime scene, but the Commonwealth withheld this evidence from Mr. Payne and trial counsel. On June 25, 1991, Mr. Payne filed a *pro se* motion for production of documents requesting, *inter alia,* a copy of the FBI report(s) used during the investigation of his crimes. On July 30, 1991, Mr. Payne filed a consolidated motion for discovery and a request for an evidentiary hearing again asserting his previous request for the production of documents. On September 9, 1991, the court entered an order, *inter alia,* scheduling an evidentiary hearing for October 1, 1991, and directing the Commonwealth to produce to Mr. Payne the results of the processing and tests done by the police or FBI. The court also granted Mr. Payne's request to proceed *pro se.*

The court held a PCRA hearing on October 1, 1991. Importantly, at the very be-

ginning of the hearing, the Commonwealth stated on the record it had fully complied with the court's September 9, 1991 order and supplied Mr. Payne with the FBI reports at issue. Mr. Payne did not dispute the Commonwealth's representation. During the hearing, Mr. Payne advanced his challenges pertaining to the ineffective assistance of trial counsel. Mr. Payne did not offer any argument at the hearing regarding his prior claim that the Commonwealth withheld exculpatory evidence. Similarly, in his post-hearing brief, Mr. Payne argued all issues presented in his PCRA petition, except for his earlier claim that the Commonwealth withheld exculpatory evidence, which Mr. Payne abandoned.

On June 26, 1992, the PCRA court denied relief. In its supporting opinion, the court expressly stated:

[Mr. Payne's] allegation that exculpatory evidence was withheld from him in the form of FBI reports is ... without merit. Testimony at the PCRA hearing indicated that all FBI information was in the possession of [Mr. Payne]. No further mention of this information was made in [Mr. Payne's] brief, leading this [c]ourt to the conclusion that the allegation of withholding exculpatory evidence is without merit.

(PCRA Court Opinion, filed June 26, 1992, at 29) (internal citation omitted).

On July 7, 1992, Mr. Payne timely filed a notice of appeal. Mr. Payne did not mention on appeal any claim that the Commonwealth withheld exculpatory evidence. On April 30, 1993, this Court affirmed Mr. Payne's conviction for second-degree murder but reversed the conspiracy conviction because the relevant statute of limitations had already run when the Commonwealth

4. 42 Pa.C.S.A. §§ 9541–9546.

charged Mr. Payne with that crime. Additionally, this Court vacated Mr. Payne's burglary sentence, where burglary was the predicate offense for the second-degree murder conviction, and remanded the case for the court to modify Mr. Payne's sentence accordingly. On July 5, 1994, the trial court vacated Mr. Payne's sentences for conspiracy and burglary.

Over twenty years after Mr. Payne first received the FBI documents, on June 14, 2012, Mr. Payne filed his current petition for DNA testing.[5] In his petition, Mr. Payne sought DNA testing of the following items recovered from the crime scene: (1) brown head hairs found on Victim's nightgown and bedsheet (designated Q8 and Q11); (2) human blood (designated Q1, Q7–Q11, Q13–Q15, Q17–Q19); and (3) a brown pubic hair (designated Q16). Mr. Payne maintained DNA testing was not available at the time of his trial and current DNA testing will reveal the absence of Mr. Payne's DNA on the evidence sought to be tested. Mr. Payne claimed the absence of his DNA would prove his actual innocence of the crimes charged.

Notably, Mr. Payne alleged in his petition he had no idea such potential "exculpatory evidence" existed. Mr. Payne stated: "For the first time (ever) [Mr. Payne] was made aware that this important new evidence does exist and is preserved and is available for DNA testing." (Petition for DNA testing, filed June 14, 2012, at 12, ¶ 19). Mr. Payne further claimed he "was just (for the very first time)—provided the proof that these exhibits/specimens Q8, Q11, and Q16, ever existed." (*Id.*) Mr. Payne alleged he received this information from the FBI (mailed to his attorney) on January 8, 2012. Mr. Payne continued: "I want to emphasize that (at no time previ-ous to this) was I aware that the evidence/specimens Q8, Q11, Q16, ever existed. Only when the FEDERAL BUREAU OF INVESTIGATION, provided this information was [Mr. Payne] *alerted to these specimens* that existed." (*Id.* at 13, ¶ 19) (emphasis in original). Mr. Payne attached to his petition a letter from the FBI dated December 30, 2011, addressed to Mr. Payne (c/o Attorney Enid Harris) informing Mr. Payne the FBI was providing him with 110 pages from the FBI file regarding Victim's murder, pursuant to the Freedom of Information/Privacy Act. The attached FBI file contains letters from the police dated December 20, 1981, and December 24, 1981, requesting testing and examination of physical evidence recovered from the crime scene. The attached FBI file also contains the FBI's analyses of the physical evidence by documents dated December 21, 1981, December 30, 1981, February 18, 1982, and January 24, 1983.

The court appointed counsel to represent Mr. Payne on January 3, 2013. On April 19, 2013, the court held a hearing on Mr. Payne's request for DNA testing. Mr. Payne testified at the hearing that he did not receive the FBI file until December 2011. Mr. Payne claimed the results of DNA testing would establish his actual innocence. Mr. Payne also asserted that performance of DNA testing will give the Commonwealth an opportunity to discover the "true" killer by comparing the DNA tested to national databases.

The Commonwealth argued DNA testing would not establish Mr. Payne's actual innocence because police officers conceded at Mr. Payne's jury trial that no physical evidence connected him to the crimes; and

5. Mr. Payne alleges he originally filed his request for DNA testing on February 9, 2012, but the court misplaced it or failed to file it.

The approximate four-month difference in the filing date is immaterial to my analysis.

the jury convicted Mr. Payne in the absence of physical evidence.

On May 23, 2013, the PCRA court granted Mr. Payne's request for DNA testing, deciding Mr. Payne had presented a *prima facie* case of actual innocence. Significantly, the PCRA court did not address the timeliness of Mr. Payne's petition. The Commonwealth timely filed a notice of appeal on June 18, 2013. On June 19, 2013, the court ordered the Commonwealth to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), which the Commonwealth timely filed on July 8, 2013. On October 3, 2014, a panel of this Court affirmed the PCRA court's order granting Mr. Payne's request for DNA testing, with one dissent. On October 17, 2014, the Commonwealth filed a petition for *en banc* review, which this Court granted.

To begin, our standard of review in this case is as follows:

> Generally, the trial court's application of a statute is a question of law that compels plenary review to determine whether the court committed an error of law. When reviewing an order [granting or] denying a motion for post-conviction DNA testing, this Court determines whether the movant satisfied the statutory requirements listed in Section 9543.1. We can affirm the court's decision if there is any basis to support it, even if we rely on different grounds to affirm.

*Commonwealth v. Williams*, 35 A.3d 44, 47 (Pa.Super.2011), *appeal denied*, 616 Pa. 467, 50 A.3d 121 (2012) (internal citations omitted).

Requests for post-conviction DNA testing are governed by statute at 42 Pa. C.S.A. § 9543.1, which provides in pertinent part:

§ 9543.1. Postconviction DNA testing

(a) Motion.—

(1) An individual convicted of a criminal offense in a court of this Commonwealth and serving a term of imprisonment or awaiting execution because of a sentence of death may apply by making a written motion to the sentencing court for the performance of forensic DNA testing on specific evidence that is related to the investigation or prosecution that resulted in the judgment of conviction.

(2) The evidence may have been discovered either prior to or after the applicant's conviction. The evidence shall be available for testing as of the date of the motion. If the evidence was discovered prior to the applicant's conviction, the evidence shall not have been subject to the DNA testing requested because the technology for testing was not in existence at the time of the trial or the applicant's counsel did not seek testing at the time of the trial in a case where a verdict was rendered on or before January 1, 1995, or the applicant's counsel sought funds from the court to pay for the testing because his client was indigent and the court refused the request despite the client's indigency.

(b) Notice to the Commonwealth.—

(1) Upon receipt of a motion under subsection (a), the court shall notify the Commonwealth and shall afford the Commonwealth an opportunity to respond to the motion.

(2) Upon receipt of a motion under subsection (a) or notice of the motion, as applicable, the Commonwealth and the court shall take the steps reasonably necessary to ensure that any remaining biological material in the possession of the Commonwealth or the court is preserved pending the completion of the proceedings under this section.

**(c) Requirements.**—In any motion under subsection (a), under penalty of perjury, the applicant shall:

(1)(i) specify the evidence to be tested;

(ii) state that the applicant consents to provide samples of bodily fluid for use in the DNA testing; and

(iii) acknowledge that the applicant understands that, if the motion is granted, any data obtained from any DNA samples or test results may be entered into law enforcement databases, may be used in the investigation of other crimes and may be used as evidence against the applicant in other cases.

(2)(i) assert the applicant's actual innocence of the offense for which the applicant was convicted; and

\* \* \*

(3) present a *prima facie* case demonstrating that the:

(i) identity of or the participation in the crime by the perpetrator was at issue in the proceedings that resulted in the applicant's conviction and sentencing; and

(ii) DNA testing of the specific evidence, assuming exculpatory results, would establish:

(A) the applicant's actual innocence of the offense for which the applicant was convicted;

\* \* \*

**(d) Order.**—

(1) Except as provided in paragraph (2), the court shall order the testing requested in a motion under subsection (a) under reasonable conditions designed to preserve the integrity of the evidence and the testing process **upon a determination, after review**

of the record of the applicant's trial, that the:

(i) requirements of subsection (c) have been met;

(ii) evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been altered in any material respect; and

(iii) **motion is made in a timely manner and for the purpose of demonstrating the applicant's actual innocence and not to delay the execution of sentence or administration of justice.**

(2) The court shall not order the testing requested in a motion under subsection (a) if, after review of the record of the applicant's trial, the court determines that there is no reasonable possibility that the testing would produce exculpatory evidence that:

(i) would establish the applicant's actual innocence of the offense for which the applicant was convicted;

\* \* \*

**(f) Posttesting procedures.**—

(1) After the DNA testing conducted under this section has been completed, the applicant may, pursuant to section 9545(b)(2) (relating to jurisdiction and proceedings), during the 60–day period beginning on the date on which the applicant is notified of the test results, petition to the court for postconviction relief pursuant to section 9543(a)(2)(vi) (relating to eligibility for relief).

(2) Upon receipt of a petition filed under paragraph (1), the court shall consider the petition along with any answer filed by the Commonwealth and shall conduct a hearing thereon.

(3) In any hearing on a petition for postconviction relief filed under paragraph (1), the court shall determine

whether the exculpatory evidence resulting from the DNA testing conducted under this section would have changed the outcome of the trial as required by section 9543(a)(2)(vi).

\* \* \*

42 Pa.C.S.A. § 9543.1 (emphasis added).

Thus, under Section 9543.1(a):

The statute sets forth several threshold requirements to obtain DNA testing: (1) the evidence specified must be available for testing on the date of the motion; (2) if the evidence was discovered prior to the applicant's conviction, it was not already DNA tested because (a) technology for testing did not exist at the time of the applicant's trial; (b) the applicant's counsel did not request testing in a case that went to verdict before January 1, 1995; or (c) counsel sought funds from the court to pay for the testing because his client was indigent, and the court refused the request despite the client's indigency.

*Williams, supra* at 49 (citing 42 Pa.C.S.A. § 9543.1(a)(2)).

Additionally:

The text of the statute set forth in Section 9543.1(c)(3) and reinforced in Section 9543.1(d)(2) requires the applicant to demonstrate that favorable results of the requested DNA testing would establish the applicant's actual innocence of the crime of conviction. The statutory standard to obtain testing requires more than conjecture or speculation; **it demands a *prima facie* case that the DNA results, if exculpatory, would establish actual innocence.**

*Id.* (emphasis added). In DNA testing cases, "an absence of evidence is not evidence of absence." *Commonwealth v. Heilman,* 867 A.2d 542, 547 (Pa.Super.2005). *See also Commonwealth v. Smith,* 889 A.2d 582 (Pa.Super.2005), *appeal denied,* 588 Pa. 769, 905 A.2d 500 (2006) (affirming denial of request for post-conviction DNA testing where absence of appellant's DNA from victim's fingernails would not establish appellant's innocence of victim's murder).

In addition to a showing of actual innocence, an equally important eligibility requirement under the DNA statute is Section 9543.1(d), which commands the petitioner to make a **timely** request for DNA testing.[6] *See* 42 Pa.C.S.A. § 9543.1(d)(1)(iii). The PCRA court is required to analyze the timeliness of the DNA petition under Section 9543.1(d)(1)(iii) and decide if the purpose of the applicant's request for post-conviction DNA testing is to delay the execution of sentence or administration of justice. *Edmiston, supra* at 578, 65 A.3d at 357.

In *Edmiston,* the defendant was convicted of first-degree murder, rape, statutory rape and involuntary deviate sexual intercourse, stemming from events that occurred on October 5, 1988, when the defendant kidnapped the two-year-old victim, inflicted gruesome injuries on her, murdered her and left her body in a wooded area. On October 5, 1989, a jury decided in favor of a sentence of death for the defendant's crimes. Twenty years later, on September 30, 2009, the defendant filed a motion for post-conviction DNA testing.

---

**6.** The timeliness requirement under Section 9543.1(d) is unique to the DNA statute; it is distinct from the jurisdictional timeliness provisions under the PCRA, which do not apply to DNA petitions. *See Williams, supra* (explaining motions for post-conviction DNA testing are separate and distinct from claims brought pursuant to other general provisions of PCRA; thus, one-year jurisdictional time bar related to general PCRA provisions does not apply to motions for DNA testing under Section 9543.1).

In reviewing the PCRA court's denial of the defendant's DNA petition, the Supreme Court confronted the timeliness requirement of a motion for post-conviction DNA testing as an issue of first impression. *See id.* at 578, 65 A.3d at 356. The Court recited the statutory language under Section 9543.1(d), which governs the PCRA court's review of the DNA petition. *See* 42 Pa.C.S.A. § 9543.1(d). The Court continued:

> The applicant, as the moving party, bears the burden of showing that the test is requested for the purpose of demonstrating actual innocence and not for delay. Here, although the trial court purported to find that the motion was timely, it observed that it could not know with certainty whether the motion was filed merely for the purpose of delay. The PCRA court identified other factors to support its finding of timeliness, specifically referring to advances in technology, the nature of the issues raised in the serial PCRA petition, no claim of prejudice by the Commonwealth, and the sentence of death, but did not explain how these factors are relevant to an assessment of timeliness under Section 9543.1(d)(1)(iii).
>
> Respectfully, we agree with the Commonwealth that the PCRA court's declaration that it could not know for sure what Appellant's incentive was for filing the petition for DNA testing demonstrates a misperception of the court's obligation to render a specific determination in this respect. Timing determinations requiring examination of case-specific factors are not particularly unusual or difficult and, in any event, ..., any difficulty in the applicant's proof does not relieve the defense of its burden or the PCRA court of its duty.... As difficult as it may be, PCRA courts are specifically charged with making this determination.

Although the PCRA court did not make the requisite finding of timeliness, we see no need to remand for the court to do so because, ..., our own review of the record and circumstances surrounding [the defendant's] post-conviction DNA testing request leads to the conclusion that this motion was untimely as a matter of law and was forwarded only to delay further the execution of the sentence....

[The defendant] has known of the existence of physical evidence he now seeks to test since his trial over twenty years ago. From that time to the present he has been represented by counsel, who knew of the statute, the technology, and the evidence, and who were vigorously pursuing post-conviction relief on his behalf. Under such circumstances, courts should exercise a healthy skepticism when faced with requests for DNA testing.

This is especially true when, as here, careful examination of the record reveals that [the defendant] is not a likely candidate to be exonerated by DNA testing.

\* \* \*

The PCRA court also spoke of "advances in technology," but as the Commonwealth notes, the statute does not make advances in technology an excuse for failing timely to request DNA testing. The statute recognized that the testing available at the time of its enactment was of sufficient reliability that defendants could seek DNA testing, in cases where good faith claims of innocence were timely raised. [The defendant's] guilty status has not changed since his 1989 conviction; advances in technology allegedly occurring after that date do not explain why he, if truly innocent, did not seek immediate testing, or, at the very

least, testing available as technology improved during the intervening years, rather than languishing on death row, all the while being supposedly innocent.

\* \* \*

Taking into consideration the strength of the evidence proffered against [the defendant] at trial, as the DNA testing provision explicitly requires, [the defendant's] deliberate decision at the time of trial not to seek further scientific testing, his counsel's apparent decision not to seek DNA testing throughout these lengthy post-conviction proceedings, and the belated timing of the current claim, **it cannot reasonably be concluded that his DNA testing motion was made in a timely manner and for the purpose of demonstrating the applicant's actual innocence and not to delay the execution of sentence or administration of justice.**

*Id.* at 578–81, 65 A.3d at 356–59 (internal citations and quotation marks omitted) (emphasis added). Thus, our Supreme Court affirmed the order denying post-conviction DNA testing, albeit on other grounds. *Id.* at 581–82, 65 A.3d at 359. *See also Commonwealth v. Walsh*, 125 A.3d 1248, 2015 PA Super 222 (holding appellant failed to request DNA testing in timely manner, where appellant knew of existence of hammer at time of his trial in 2004 and did not seek DNA testing of hammer until 2014).

The take-away from *Edmiston* and *Walsh* is first that petitioners seeking DNA testing must exercise due diligence in pursuing requests for relief under Section 9543.1, or they will be ineligible for relief under the DNA statute. *See* 42 Pa.C.S.A. § 9543.1(d)(1)(iii); *Edmiston, supra*; *Walsh, supra*. Next, our Supreme Court made clear that Section 9543.1(d)(1)(iii) specifically charges the

PCRA court to assess whether the petition is timely filed. *See Edmiston, supra.* *See also Commonwealth v. Scarborough*, 619 Pa. 353, 364, 64 A.3d 602, 609 (2013) (stating: "If the movant is successful in making this showing [of actual innocence] **and the court additionally determines the requirements of 42 Pa.C.S.A. § 9543.1(d)(1) have been met,** as well as determines the testing is not barred by the provisions of 42 Pa.C.S.A. § 9543.1(d)(2), the relief the movant receives is the trial court's ordering of the requested DNA testing on the particular evidence specified in the motion ...") (emphasis added). This timeliness assessment is **mandatory** under the DNA statute, and stands as a threshold eligibility inquiry, regardless of whether the Commonwealth complains. *See id.*

Instantly, I am convinced Mr. Payne's current DNA request is untimely as a matter of law. At Mr. Payne's jury trial in 1986, Officer Miller and Detective Harman testified they collected physical evidence from the crime scene and submitted it to the FBI for testing and examination. Neither Mr. Payne nor his trial counsel made any claim at trial that the Commonwealth had failed to disclose the FBI's findings or that they were not made available to the defense during pre-trial discovery. In his direct appeal, Mr. Payne similarly made no claim that he was not privy to the FBI's findings discussed at trial.

On June 7, 1991, Mr. Payne alleged for the first time that the Commonwealth submitted for testing physical evidence found at the crime scene and withheld this evidence from Mr. Payne and trial counsel. On June 25, 1991, Mr. Payne filed a *pro se* motion for production of documents requesting, *inter alia*, a copy of the FBI report(s) used during the investigation of his crimes. On July 30, 1991, Mr. Payne filed a consolidated motion for discovery and a request for an evidentiary hearing

renewing his request for the production of documents. On September 9, 1991, the court directed the Commonwealth to produce to Mr. Payne the results of the processing and tests done by the police or FBI.

The court held a PCRA hearing on October 1, 1991. Significantly, at the very beginning of the hearing, the Commonwealth stated on the record it had fully complied with the court's September 9, 1991 order and supplied Mr. Payne with, *inter alia*, the FBI reports at issue. **At no time did Mr. Payne dispute the Commonwealth's representation.** During the hearing, Mr. Payne offered no argument that the Commonwealth had withheld exculpatory evidence. Similarly, in his posthearing brief, Mr. Payne abandoned any claim that the Commonwealth had withheld exculpatory evidence. On June 26, 1992, the PCRA court denied relief. In its supporting opinion, the court expressly stated:

> [Mr. Payne's] allegation that exculpatory evidence was withheld from him in the form of FBI reports is ... without merit. Testimony at the PCRA hearing indicated that all FBI information was in the possession of [Mr. Payne]. No further mention of this information was made in [Mr. Payne's] brief, leading this [c]ourt to the conclusion that the allegation of withholding exculpatory evidence is without merit.

(PCRA Court Opinion, filed June 26, 1992, at 29) (internal citation omitted). Mr. Payne did not challenge this determination on appeal.

On July 10, 2002, the state legislature enacted the DNA statute at 42 Pa.C.S.A. § 9543.1 (effective 60 days later). Mr. Payne waited almost ten years to file his petition on June 14, 2012, for DNA testing of the following items recovered from the crime scene: (1) brown head hairs found on Victim's nightgown and bedsheet (designated Q8 and Q11); (2) human blood (designated Q1, Q7–Q11, Q13–Q15, Q17–Q19); and (3) a brown pubic hair (designated Q16). Astonishingly, Mr. Payne alleged he had no idea this potential "exculpatory evidence" existed and "[f]or the first time (ever) [he] was made aware that this important new evidence does exist and is preserved and is available for DNA testing." (Petition for DNA testing, filed June 14, 2012, at 12, ¶ 19). Mr. Payne further claimed he "was just (for the very first time)—provided the proof that these exhibits/specimens Q8, Q11, and Q16, ever existed." (*Id.*) Mr. Payne alleged he received this information from the FBI (mailed to his attorney) on January 8, 2012. Mr. Payne represented: "I want to emphasize that (at no time previous to this) was I aware that the evidence/specimens Q8, Q11, Q16, ever existed. Only when the FEDERAL BUREAU OF INVESTIGATION, provided this information was [Mr. Payne] *alerted to these specimens* that existed." (*Id.* at 13, ¶ 19) (emphasis in original). At the April 19, 2013 hearing on Mr. Payne's petition for DNA testing, he testified he did not receive the FBI file until December 2011.

Without addressing if the petition was timely under Section 9543.1(d)(1)(iii), the PCRA court limited its review to whether Mr. Payne presented a *prima facie* case of actual innocence and granted Mr. Payne's DNA request. In this regard, the court neglected its **specifically charged duty** to make a determination of timeliness prior to granting relief. *See* 42 Pa.C.S.A. § 9543.1(d)(1)(iii); *Edmiston, supra; Scarborough, supra.* In my opinion, the "timeliness" of the DNA petition is an unwaivable statutory eligibility requirement. The Commonwealth did not have to raise a specific objection to Mr. Payne's DNA petition on timeliness grounds to avoid re-

lieving "the defense of its burden or the PCRA court of its duty." *See Edmiston, supra.* Notably, the DNA statute dictates the **petitioner's** burden under the statute (*see* 42 Pa.C.S.A. § 9543.1(c)) and the court's required review of the petition (*see* 42 Pa.C.S.A. § 9543.1(d)), to obtain DNA testing. The DNA statute affords the Commonwealth **an opportunity** to respond to an applicant's petition (*see* 42 Pa.C.S.A. § 9543.1(b)(1)), but nowhere does the statute require the Commonwealth to object specifically to the petitioner's claims or to respond at all. Even in the absence of any response by the Commonwealth to a DNA petition, the petitioner still bears the burden of complying with the requirements under Section 9543.1(c), and the court still must conduct review of the petition under Section 9543.1(d). *See* 42 Pa.C.S.A. § 9543.1(c); (d); *Scarborough, supra.* Just as the PCRA court was obligated to decide whether Mr. Payne presented a case of actual innocence to be eligible for relief under the DNA statute (*see* 42 Pa. C.S.A. § 9543.1(d)(2)(i)), the court was similarly required to assess the timeliness of the petition under Section 9543.1(d)(1)(iii).

The PCRA contains analogous eligibility requirements, which the PCRA court (and our Court) must decide are met, even in the absence of an objection by the Commonwealth. *See, e.g.,* 42 Pa.C.S.A. § 9543(a)(1) (explaining that to be eligible for relief under PCRA, petitioner must plead and prove by preponderance of evidence that petitioner has been convicted of crime under laws of Pennsylvania, and is at time relief is granted currently serving sentence of imprisonment, probation or parole for crime; awaiting execution of sentence of death for crime; or serving sentence which must expire before person may commence serving disputed sentence). *See also Commonwealth v. Ahlborn,* 548 Pa. 544, 699 A.2d 718 (1997) (explaining

petitioner must be currently serving sentence of imprisonment, probation, or parole to be eligible for PCRA relief; plain language of statute requires denial of relief for petitioner who has finished serving his sentence; to grant relief at time when appellant is not currently serving sentence ignores statutory language). Thus, a defendant must be serving the sentence he is challenging in a PCRA petition as a preliminary statutory eligibility requirement that needs no specific objection to preserve it. In other words, the petitioner does not qualify for relief if he fails to meet the statutory eligibility requirements, regardless of whether the Commonwealth complains. Likewise, if the petitioner maxes out on the sentence at issue while his petition is pending, he no longer meets the statutory eligibility requirements for relief, and again the Commonwealth does not risk waiver by failing to raise the issue or to object. The timeliness requirement under the DNA statute is akin to the eligibility-for-relief requirements under the general provisions of the PCRA. Whether Mr. Payne filed his petition in a timely manner is a statutory eligibility requirement under Section 9543.1(d)(1)(iii), which the petitioner must plead and the court is bound to address as a threshold matter that cannot be waived. The Commonwealth's "duty" for purposes of a DNA petition is limited to taking steps reasonably necessary to ensure that any remaining biological material in the Commonwealth's possession is preserved pending the completion of the proceedings. *See* 42 Pa.C.S.A. § 9543.1(b)(2).

The PCRA court's failure to conduct the necessary timeliness calculation does not require remand, however, because the record makes clear Mr. Payne's DNA request is untimely as a matter of law. *See Edmiston, supra.* Quite simply, the record belies Mr. Payne's repeated allegations that

he just received the FBI file in this case. Giving Mr. Payne the benefit of the doubt, at the very **latest,** Mr. Payne received the relevant documents in 1991 during litigation of his first PCRA petition, **more than twenty years before filing his current ·request for DNA testing.** (*See* PCRA Court Opinion, filed June 26, 1992, at 29.) Mr. Payne presents no evidence whatsoever to support his bald assertions that he "just" received the FBI documents. The fact that the. FBI mailed his attorney **a copy** of the relevant documents by letter dated December 30, 2011, certainly does not prove Mr. Payne lacked possession of those documents earlier. Likewise, Mr. Payne's request for DNA testing fails to provide any evidence to support his claims that he tried to obtain the relevant FBI documents over the years, to no avail. Curiously, in his petition for DNA testing, Mr. Payne does · not even allege that he recently learned of the blood samples he wants tested—he limits his claimed "new discovery" to the hair samples.

Additionally, the FBI file attached to Mr. Payne's DNA petition contains letters from the police dated December 20, 1981, and December 24, 1981, requesting testing and examination of physical evidence recovered from the crime scene. The attached FBI file also contains the FBI's analyses of the physical evidence by documents dated December 21, 1981, December 30, 1981, February 18, 1982, and January 24, 1983. Nowhere in his DNA petition does Mr. Payne assert that the FBI file he "just" received contains **new** documents, or anything other than the documents Mr. Payne had in his possession in 1991.

Moreover, Mr. Payne did not even need the FBI documents to request DNA testing. Mr. Payne knew at the time of his trial that police had collected and submitted for testing and examination physical

evidence recovered from the crime scene. Mr. Payne could have · requested DNA testing of the physical evidence recovered in or around 1995, when DNA technology became widely available. Alternatively, once our legislature enacted the DNA statute in 2002, Mr. Payne could have petitioned the court for DNA testing of the physical evidence recovered from the crime scene. Nothing in the record· indicates that Mr. Payne exercised due diligence in pursuit of his current request for DNA testing. Rather, the record makes clear Mr. Payne had the relevant ·FBI documents in· his· possession in 1991, and failed to request DNA testing for more than twenty years. Under these circumstances, Mr. Payne's belated ·request for DNA testing is untimely as a matter of law. *See Edmiston, supra; Walsh, supra.*

In my opinion, the PCRA court erred when it granted Mr. Payne's petition for DNA testing, without examining the timeliness of the petition, because the petition was untimely under Section 9543.1(d)(1)(iii) as a matter of law.· I also agree with the other dissenting opinion that Mr. Payne failed to set forth a *prima facie* case of actual innocence under the facts of this case. Accordingly, I dissent on both bases.

Judge STABILE ·concurs in the result.

**DISSENTING OPINION BY STABILE, J.:**

I respectfully dissent. I believe the Majority fails to apply the correct statutory standard when evaluating whether the trial court erred in .granting. John Marshall Payne III's (Payne) application for DNA testing under § 9543.1. When the proper standard is applied, Payne is not entitled to DNA testing because no DNA test results, even assuming exculpatory results, can establish Payne's "actual innocence· of the offense for which [he] was convicted."·

42 Pa.C.S.A. § 9543.1(c)(3)(ii)(A). There-
fore, I would reverse the order granting
Payne's request for DNA testing.

In my opinion, the Majority commits
several errors in defining the standard for
DNA testing under § 9543.1. Foremost,
the Majority ignores entirely, and in fact
does not quote or even cite, the statutory
*prima facie* burden imposed upon an appli-
cant under § 9543.1(c)(3) that must be sat-
isfied before testing can be ordered; *i.e.*,
the presentation of a *prima facie* case that
testing, assuming exculpatory results,
would establish "actual innocence." In-
stead, the Majority ignores this initial bur-
den and focuses exclusively upon the sub-
sequent record review to be conducted by
a trial court under § 9543.1(d)(2), which is
to be considered only if a *prima facie*
showing of actual innocence is first made
in the motion for testing. The Majority is
certain to diminish and dismiss the impor-
tance of a *prima facie* showing by stating
that "[t]he sole issue for our review con-
cerns the application of the standard set
forth in Section 9543.1(d)(2) and
9543.1(d)(2)(i)," thereby placing sole con-
trolling emphasis for testing on a trial
court's record review. Majority Opinion at
15. Compounding this error further, the
Majority, ignoring well-established rules of
statutory construction, proceeds to define
the unambiguous term "actual innocence"
by reference to *Commonwealth v. Conway*,
14 A.3d 101 (Pa.Super.2011), which relies
upon inapplicable federal habeas corpus
jurisprudence. No attempt is made to dis-
tinguish *Conway* from other of this Court's
precedent in conflict with the standard
articulated in that decision. The Majority
rewrites the statutory "actual innocence"
standard under § 9543.1 to require DNA
testing if testing would simply "make it

more likely than not" that no reasonable
juror would find the defendant guilty be-
yond a reasonable doubt. Majority Opin-
ion at 556. This court-created standard is
far afield from the statutory standard of
"actual innocence" provided by our Legis-
lature. The Majority converts the clear
and unambiguous standard of "actual inno-
cence" for DNA collateral relief to one of a
preponderance of proposed evidence that
allows testing if a mere possibility exists
that a jury's verdict might have changed.
I do not believe this interpretation was
ever intended by our Legislature when it
provided for collateral relief based upon a
standard that must demonstrate "actual
innocence."

The parameters for DNA testing are
exclusively set forth under the statutory
provisions of § 9543.1.[1] By necessity, our
analysis must begin and end with the stat-
utory language provided by our Legisla-
ture under the Post Conviction Relief Act
(PCRA), 42 Pa.C.S.A. §§ 9541–46. "When
reviewing an order denying a motion for
post-conviction DNA testing, this Court
determines whether the movant satisfied
the **statutory requirements** listed in [42
Pa.C.S.A. § ] 9543.1." *Commonwealth v.
Williams*, 35 A.3d 44, 47 (Pa.Super.2011)
(emphasis added).

In relevant part, § 9543.1, relating to
post-conviction DNA testing, provides:

(a) **Motion.—**

(1) An individual convicted of a crimi-
nal offense in a court of this Common-
wealth and serving a term of imprison-
ment or awaiting execution because
of a sentence of death may apply by
making a written motion to the sen-
tencing court for the performance of
forensic DNA testing on specific evi-

1. I note there is no federal constitutional right
to post-conviction DNA testing. *District At-
torney's Office for the Third Jud. Dist. v. Os-*

*borne*, 557 U.S. 52, 55–56, 129 S.Ct. 2308,
174 L.Ed.2d 38 (2009).

dence that is related to the investigation or prosecution **that resulted in the judgment of conviction.**

\* \* \*

(c) **Requirements.**—In any motion under subsection (a), under penalty of perjury, the applicant shall:

(1)(i) specify the evidence to be tested;

(ii) state that the applicant consents to provide samples of bodily fluid for use in the DNA testing; and

(iii) acknowledge that the applicant understands that, if the motion is granted, any data obtained from any DNA samples or test results may be entered into law enforcement databases, may be used in the investigation of other crimes and may be used as evidence against the applicant in other cases.

(2)(i) assert the applicant's actual innocence of the offense for which the applicant was convicted[.]

\* \* \*

(3) present a *prima facie* case demonstrating that the:

(i) identity of or the participation in the crime by the perpetrator was at issue in the proceedings that resulted in the applicant's conviction and sentencing; and

(ii) **DNA testing of the specific evidence, assuming exculpatory results, would establish:**

(A) **the applicant's actual innocence of the offense for which the applicant was convicted[.]**

(d) **Order.**—

(1) Except as provided in paragraph (2), the court shall order the testing requested in a motion under subsection (a) under reasonable conditions designed to preserve the integrity of the evidence and the testing process upon a determination, after review of the record of the applicant's trial, that the:

(i) requirements of subsection (c) have been met;

(ii) evidence to be tested has been subject to a chain of custody sufficient to establish that it has not been altered in any material respect; and

(iii) motion is made in a timely manner and for the purpose of demonstrating the applicant's actual innocence and not to delay the execution of sentence or administration of justice.

(2) **The court shall not order the testing requested in a motion under subsection (a) if, after review of the record of the applicant's trial, the court determines that there is no reasonable possibility that the testing would produce exculpatory evidence that:**

(i) **would establish the applicant's actual innocence of the offense for which the applicant was convicted[.]**

42 Pa.C.S.A. § 9543.1(c)–(d) (emphasis added) (provisions concerning capital cases omitted).

The above provisions set forth clear procedures to be followed in order for postconviction DNA testing to be ordered by a court. First, the motion for DNA testing must relate to the judgment of conviction. 42 Pa.C.S.A. § 9543.1(a). This prerequisite defines the relevant parameters against which the proposed testing is to be measured. Here, Payne was convicted of second-degree (or felony) murder, aggra-

vated assault, burglary, and conspiracy.[2] Second, the applicant must state, under penalty of perjury, the specific evidence to be tested, must consent to samples of bodily fluid for DNA testing, and must acknowledge that any data obtained from testing may be entered into databases and may be used against him or her in any other cases. 42 Pa.C.S.A. § 9543.1(c)(2). The applicant also must assert "actual innocence" of the offense that resulted in the conviction. *Id.* The required averment is one of actual innocence, not one of merely asserting not guilty beyond a reasonable doubt. Third, and perhaps most important, the motion must set forth on its face a *prima facie* case demonstrating that the identity of, or participation in the crime by, the applicant is at issue, and that DNA testing, assuming exculpatory results, would establish the applicant's **actual innocence** of the offense for which he or she was convicted. 42 Pa.C.S.A. § 9543.1(c)(3). Only **after** an applicant has satisfactorily presented a motion demonstrating a *prima facie* case that DNA testing, assuming exculpatory results, would establish actual innocence, is a court then obligated to review the record of the case independently to determine if there is a reasonable possibility the DNA exculpatory evidence would establish actual innocence. 42 Pa.C.S.A. § 9543.1(d)(2). If the motion does not satisfy the *prima facie* threshold then the motion should be denied without a record review. If the motion passes muster, the record review requires that the court essentially scrutinize the applicant's theory of DNA testing against the trial record. Assuming the applicant's motion has demonstrated a *prima facie* showing of actual innocence based upon the proposed DNA testing, a court may only then refuse testing if it

determines that the applicant's theory cannot be reasonably supported by the trial record. This record review, however, does not diminish the *prima facie* showing of "actual innocence" based upon exculpatory DNA testing that first must be satisfied by an applicant before testing can be ordered. This procedure is entirely consistent with this Court's prior precedent in *Williams* wherein we said:

> The text of the statute set forth in Section 9543.1(c)(3) and reinforced in Section 9543.1(d)(2) requires the applicant to demonstrate that favorable results of the requested DNA testing would establish the applicant's actual innocence of the crime of conviction. The statutory standard to obtain testing requires more than conjecture or speculation; it demands a *prima facie* case that the DNA results, if exculpatory, would establish actual innocence.

*Williams*, 35 A.3d at 50 (citing *Commonwealth v. Smith*, 889 A.2d 582, 585–86 (Pa.Super.2005), *appeal denied*, 588 Pa. 769, 905 A.2d 500 (2006)). For reasons unclear to this author, the Majority did not recite or discuss the mandatory language of § 9543.1(c)(3)(ii)(A) in the "pertinent statutory language at issue" in this case. *See* Majority Opinion at 554–55. The Majority, as mentioned above, focused instead only upon § 9543.1(d)(2), *i.e.*, the court's later independent record review after a *prima facie* case has been demonstrated. Rather than consider the statutory mandate of § 9543.1(c)(3)(ii), the Majority instead looked to *Conway* for a definition of "actual innocence," stating:

> In *Conway*, 14 A.3d at 109, this Court applied a definition of "actual innocence" taken from "the United States Supreme Court in its Opinion in *Schlup v. Delo*, 513 U.S. 298, 327 [115 S.Ct. 851, 130

**2.** I recognize Payne's conviction for conspiracy was reversed on a statute of limitation

determination. I have included it here only for purposes of factual completeness.

L.Ed.2d 808] (1995), namely, that the newly discovered [DNA] evidence must make it 'more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt.'"

Majority Opinion at 556 (quoting *Conway*, 14 A.3d at 109) (brackets and language inserted in brackets in original). *Conway* not only ignored established principles of statutory construction by looking to federal law to define "actual innocence," but also wrongly relied upon inapplicable federal habeas corpus jurisprudence that predated the passage of our DNA testing statute.[3]

In further justification to rewrite § 9543.1, the Majority holds that § 9543.1 is a remedial statute and therefore must be interpreted liberally. Majority Opinion at 554; *see also Conway*, 14 A.3d at 113–14 (quoting the legislative history of § 9543.1). However, this Court cannot disregard the letter of the law in favor of pursuing its spirit. As we have stated:

> Pennsylvania's Statutory Construction Act, 1 Pa.C.S. § 1921, focuses our review and negates any consideration of matters extraneous to the statutory language except in instances where such language is ambiguous. *See* 1 Pa.C.S. § 1921(b) ("When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.").

*Commonwealth v. Moran*, 5 A.3d 273, 279–80 (Pa.Super.2010). "A statute's plain language generally provides the best indication of legislative intent." *Commonwealth v. McCoy*, 599 Pa. 599, 962 A.2d 1160, 1166 (2009). Here, there is no need to resort to federal case law to define the statutory term "actual innocence," as the term is clear and unambiguous on its face. The term is capable of being construed according to its plain meaning. "Actual innocence" plainly means that the defendant did not commit the crime for which he or she was convicted. The plain meaning of the term does not admit standards of reasonableness, probability, or reasonable doubt into its connotation. Therefore, when § 9543.1(c)(3) states that an applicant shall plead and demonstrate a *prima facie* case that exculpatory DNA evidence would establish "actual innocence," the statute plainly requires that the applicant demonstrate in a motion that the exculpatory DNA evidence would establish that he or she did not commit the crime of which they were convicted. As discussed herein, I find Payne's motion did not demonstrate a *prima facie* case of actual innocence and, therefore, a record review by the trial court was unnecessary. The motion should have been denied.

My disagreement with the Majority's reliance upon *Conway* goes beyond mere disagreement on how or when to define a term. Simply stated, the court-created standard enunciated in *Schlup*, upon which *Conway* relies, has no bearing on Pennsylvania's statutory standard under § 9543.1. *Schlup* clarified the federal standard that must be met when innocence is claimed and a conviction is alleged to be the result of a constitutional error. Schlup concerned a federal habeas corpus proceeding wherein the United States Supreme Court addressed the appropriate standard to be applied when a petitioner alleges actual innocence and a conviction based on a constitutional violation, where the violation would ordinarily be barred from being considered on its merits. As explained in *House v. Bell*, 547 U.S. 518, 126 S.Ct. 2064,

---

**3.** *Schlup* was decided in 1995. Our DNA testing statute was added to the PCRA in 2002.

165 L.Ed.2d 1 (2006), as a general rule, claims forfeited under state law may support federal habeas corpus relief only if a prisoner demonstrates cause for default and prejudice from the asserted error. *Id.* at 536, 126 S.Ct. 2064. This bar, however, is not unqualified, such as when there is a miscarriage of justice. *Id.* In *Schlup*, adhering to this general principle, the Court held that prisoners asserting innocence as a gateway to defaulted state claims must establish that, in light of new evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *House* at 537, 126 S.Ct. 2064 (quoting *Schlup*, 513 U.S. at 327, 115 S.Ct. 851). This stands in contrast to review of a federal freestanding innocence claim where no constitutional error is alleged and the burden then is one of clear and convincing evidence of innocence. *See Herrera v. Collins*, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). Moreover, unlike § 9543.1, these federal standards are not limited to evaluating DNA evidence. As is apparent, the difference in federal law between gateway claims of innocence alleging constitutional error and freestanding innocence claims without constitutional error do not involve or implicate state-level collateral relief proceedings under our PCRA. Nor do they interpret statutory provisions like § 9543.1. Quite simply they are irrelevant to the issue before this Court. The Majority's use of federal habeas corpus standards to define "actual innocence" under § 9543.1 is wholly without foundation and is inconsistent with our rules of statutory construction. Nothing in the text of the PCRA statute indicates that the General Assembly intended to import a federal habeas corpus standard into the DNA testing provisions of our PCRA.

Turning now to the merits of Payne's motion, we first must examine the crimes of which Payne stands convicted to determine if Payne has met the required *prima facie* showing of actual innocence under 9543.1(c)(3)(ii). As stated, Payne was convicted of second-degree or felony murder, aggravated assault,[4] and burglary. The trial court charged the jury on the elements of these crimes and, more importantly, instructed the jury that Payne could be found guilty of any of them based upon his own acts, or as an accomplice of others who committed the crimes. N.T. Trial (Jury Charge), 8/18–8/22/86, at 713 (burglary), 715–16 (accomplice liability generally), and 719 (homicide). Therefore, and in particular regard to the victim's murder, a jury could find Payne guilty of this murder (and in fact did) even if he was not present in the victim's bedroom at the time the murder was committed, based upon his guilt as an accomplice. Any theory of actual innocence pled by Payne in his motion for DNA testing, by necessity, would have to establish that he was not present at all at the scene of the crimes. Simply establishing that someone else may have committed or did commit the actual crimes of which he was convicted, or that someone else also may have been present during the commission of the crimes, would not establish Payne's actual innocence of guilt as an accomplice to these crimes.

In his motion, Payne seeks DNA testing of a) brown head hairs, b) a brown pubic hair, and c) specimens of human blood. Payne Petition, 6/14/12, at ¶ 10. Payne maintains these specimens were found on the nightgown, bedsheet, and blanket of the victim and that DNA testing will show these specimens came from a Caucasian, demonstrating this person was in the vic-

---

4. The conviction for aggravated assault was merged into the murder conviction.

tim's bedroom. *Id.* at ¶¶ 11, 21. Finally, Payne contends that since the assault upon the victim was extremely violent, the blood samples will exclude Payne as the source of this blood and will result in the identity of the victim's killer. *Id.* at ¶¶ 23, 24. Upon these bases, Payne asserts his actual innocence of the crimes committed. Even accepting as true Payne's assertion these specimens came from someone other than Payne himself, this proof would not eliminate Payne from being present at the crime scene, or eliminate him as an accomplice during the commission of the crimes of which he was convicted. Under relevant law, Payne could be convicted of the underlying crimes without ever having entered the victim's bedroom.[5] This is especially significant, as the Commonwealth's theory of the case was that Payne committed the crimes in concert with others. To this end, the Commonwealth introduced into evidence the testimony of three witnesses who testified that Payne confessed to his role in the criminal enterprise. Further demonstrating his guilt, Payne admitted he contacted one Commonwealth witness and attempted to influence her testimony in his favor. It appears the jury returned a verdict of guilty based largely on this circumstantial evidence. Therefore, I do not believe Payne's motion for DNA testing satisfied the threshold *prima facie* case that, assuming exculpatory results, *i.e.,* either the absence of Payne's DNA or the presence of someone else's, the evidence would demonstrate Payne's actual innocence of the crimes of which he was convicted. Accordingly, Payne's motion should have been denied without further review. This determination would have made it unnecessary for the court to proceed further and conduct its own review of the record under 9543.1(d)(2).

Finally, in another regard I find the Majority's legal analysis puzzling and hard to follow. At one point, the Majority notes its agreement with the Commonwealth and acknowledges this Court's previous holdings to the effect that the absence of an accused's DNA evidence—by itself—cannot satisfy § 9543.1(d)(2)(i)'s "actual innocence" standard. *See* Majority Opinion at 556–58 (citing *Commonwealth v. Heilman,* 867 A.2d 542, 547 (Pa.Super.2005); *Smith,* 889 A.2d at 586 (Pa.Super.2005); and *Commonwealth v. Brooks,* 875 A.2d 1141 (Pa.Super.2005)). The Majority announces, and I concur, that:

> [T]o the extent that the Commonwealth asserts that the absence of Payne's DNA on the items to be tested would not, by itself, establish a *prima facie* case that he is actually innocent, we agree. Additionally, there are no circumstances in this case that, in combination with the absence of Payne's DNA in a specific location, would demonstrate his actual innocence.

Majority Opinion at 560. However, despite acknowledging that the absence of Payne's DNA cannot demonstrate his actual innocence, the Majority inexplicably forges ahead, accepting Payne's "data bank theory" that suggests the actual killer **might** be revealed by comparing DNA test results with state and national databases. *Id.* I agree with the Commonwealth that Payne's data bank theory is insufficient for him to meet his burden. Sections 9543.1(c)(3) and (d)(2) focus on the **applicant's** actual innocence—not some possible, speculative result that an unrelated third party's DNA, or even an accomplice's DNA, might be found.

---

**5.** The Majority acknowledges, Payne "might have been convicted of second-degree murder as an accomplice to the underlying burglary even in the absence of a conspiracy conviction." Majority Opinion at 561. *See* 18 Pa. C.S.A. § 306(c) (defining accomplice liability).

Ultimately, the Majority appears to rest its "someone-else's-DNA-plus" standard on the unsupported theory that DNA from one of the Commonwealth's witnesses could be identified by testing, thereby seriously undermining the Commonwealth's case. *See* Majority Opinion at 561. There is not a scintilla of evidence that supports the Majority's speculation—not even Payne's petition. Instead, I would accept the Commonwealth's argument, which echoes the well-ensconced maxim that "the absence of evidence is not evidence of absence." *See, e.g., Heilman*, 867 A.2d at 546–47.[6] As the Commonwealth aptly explained, where—as here—a person is convicted of felony murder without the aid of any physical evidence linking him to the crime, it is obvious the jury was not swayed by the absence of physical evidence in the first instance. Commonwealth Resubmitted Brief at 20. Therefore, it follows that "new" physical evidence augmenting the dearth of incriminating physical evidence or, at best, implicating an accomplice, is not *ipso facto* grounds to find *prima facie* evidence that Payne is actually innocent of the crimes of which he was convicted.

In conclusion, I respectfully dissent from the Majority because I believe Payne failed to set forth a *prima facie* case of actual innocence in his motion for DNA testing. It also is my belief the Majority has ignored critical provisions of the DNA testing statute and, further, has rewritten the applicable standard of "actual innocence" under § 9543.1 to a mere preponderance of evidence based upon inapplicable federal habeas corpus law and in disregard of our rules of statutory construction.

President Judge GANTMAN concurs in the result.

---

6. In *Heilman*, we explained:
 > On its face, the *prima facie* requirement set forth in § 9543.1(c)(3) and reinforced in § 9543.1(d)(2) requires an appellant to demonstrate that favorable results of the requested DNA testing *"would establish"* the appellant's actual innocence of the crime of conviction. Heilman has failed to make such a demonstration, nor could he. In DNA as in other areas, an absence of evidence is not evidence of absence. Furthermore, a murder suspect may be convicted on wholly circumstantial evidence, of which there was plenty in this case.

 *Id.* (citation omitted) (emphasis in original). Even the PCRA court recognized, "To put it plainly, if the jury had believed that there were three intruders then the simple fact that none of the DNA matched [Payne] does not preclude [Payne] from having been present. It is entirely possible, through luck or concealment, that [Payne] left no DNA behind." PCRA Court Opinion in Support of Order, 5/22/13, at 9. Nevertheless, the PCRA court later speculated, "A jury might indeed have placed more emphasis on the weaknesses of [the] Commonwealth's case if there were DNA evidence introduced and it did not directly tie [Payne] to the murder scene." PCRA Court Rule 1925(a) Opinion, 8/14/13, at 12. This speculation clearly falls short of the requirement in § 9543.1(c)(3) and § 9543.1(d)(2) that the applicant demonstrate testing "would establish" his "actual innocence."